[S.F. No. 24171. July 9, 1984.]

AMERICAN BANK AND TRUST COMPANY,
as Special Administrator, etc., Plaintiff and Respondent, v.
COMMUNITY HOSPITAL OF LOS GATOS-SARATOGA, INC.,
Defendant and Appellant.

**COUNSEL**

Thomas R. Fellows, Robinson & Wood, Wines, Robinson & Wood and Wines, Robinson, Wood & Anderson for Defendant and Appellant.

John H. Larson, County Counsel (Los Angeles), Peter R. Krichman, Deputy County Counsel, Hassard, Bonnington, Rogers & Huber, David E. Willett, Maureen E. Corcoran, Howard Hassard, Charles Bond, Musick, Peeler & Garrett, James E. Ludlam, Horvitz & Greines, Horvitz, Greines

■■■■■■■■■■
■■■■
■■■■■■■■■

& Poster, Ellis J. Horvitz, Marjorie G. Romans, Kent L. Richland, John L. Klein, Livingston & Mattesich, James M. Mattesich, Fred J. Hiestand, Paul Halvonik, L. Savannah Lichtman, Donald L. Reidhaar, James E. Holst, John F. Lundberg, Alschuler, Grossman & Pines, Burt Pines, Howard Wollitz, Latham & Watkins, Bryant C. Danner, Donald P. Newell, Joseph A. Wheelock, Jr., Milton A. Miller, Natalie E. West, City Attorney (Berkeley), George Agnost, City Attorney (San Francisco), Burk E. Delventhal and Thomas J. Owen, Deputy City Attorneys, as Amici Curiae on behalf of Defendant and Appellant.

Popelka, Allard, McCowan & Jones, Bernard J. Allard, Donald D. Howard, Stephan A. Barber and Michael J. Murray for Plaintiff and Respondent.

Arne Werchick, Leonard Sacks, Glen T. Bashore, Ralph Drayton, Richard D. Bridgman, Robert E. Cartwright, Ian Herzog, Edward I. Pollock, Harvey R. Levine, Stephen I. Zetterberg, Wylie Aitken, Sanford M. Gage, J. Nick DeMeo, David M. Harney, Michael F. Dillingham, Franklin C. Valvo and Frederick Barak as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

**KAUS, J.**—In May 1975, the Governor—citing serious problems that had arisen throughout the state as a result of a rapid increase in medical malpractice insurance premiums—convened the Legislature in extraordinary session to consider measures aimed at remedying the situation.[1] In response, the Legislature enacted the Medical Injury Compensation Reform Act of 1975 (MICRA) (Stats. 1975, Second Ex. Sess. 1975-1976, chs. 1, 2, pp. 3949-4007), a lengthy statute which attacked the problem on several fronts. In broad outline, the act (1) attempted to reduce the incidence and severity of medical malpractice injuries by strengthening governmental oversight of the education, licensing and discipline of physicians and health care providers, (2) sought to curtail unwarranted insurance premium increases by authorizing alternative insurance coverage programs and by establishing new procedures to review substantial rate increases, and (3) at-

---

[1] The Governor's proclamation stated in part: "The cost of medical malpractice insurance has risen to levels which many physicians and surgeons find intolerable. The inability of doctors to obtain such insurance at reasonable rates is endangering the health of the people of this State, and threatens the closing of many hospitals. The longer term consequences of such closings could seriously limit the health care provided to hundreds of thousands of our citizens." (Governor's Proclamation to Leg. (May 16, 1975) Stats. 1975 (Second Ex. Sess. 1975-1976) p. 3947.)

tempted to reduce the cost and increase the efficiency of medical malpractice litigation by revising a number of legal rules applicable to such litigation.

This case involves a wide-ranging constitutional challenge to one of the provisions of MICRA affecting medical malpractice lawsuits—a provision codified as section 667.7 of the Code of Civil Procedure.[2] Section 667.7 provides that when a plaintiff in a medical malpractice case has sustained "future damages" of $50,000 or more, compensation for those future damages is to be paid periodically over the course of time the plaintiff incurs the losses, rather than in a lump sum payment at the time of judgment. Plaintiff attacks this "periodic payment of damages" provision on a variety of grounds, contending, inter alia, that it violates the state and federal constitutional guarantees of due process, equal protection, and the right to jury trial.

As explained hereafter, we have concluded that section 667.7 does not deny due process or equal protection. In order to avoid a potential conflict with the right to trial by jury, however, we conclude that the provision should be interpreted to require the jury to designate the portion of its award attributable to future damages. As so interpreted, we conclude that the provision is constitutional.

I

For purposes of this appeal, the facts may be briefly summarized. Late in 1976, after a brain scan had disclosed a lesion or tumor, plaintiff Mary English[3] was admitted to defendant Community Hospital of Los Gatos-Saratoga for surgery. On the eve of her scheduled operation, she fainted or fell in a shower stall and suffered severe burns to her thigh, hip, and groin, as a result of overheated water. After the burns had been treated and dressed by her neurosurgeon, the brain surgery proceeded as scheduled. The tumor, though then in remission, was found to be malignant and of a type which reportedly results in death within one year in 95 percent of all cases. Following release from the hospital, plaintiff received radiation and chemotherapy treatments.

Plaintiff was treated for her burn injuries by a plastic surgeon under whose care a gradual but steady healing took place. Because of the burns, however,

---

[2]Unless otherwise specified, all section references are to the Code of Civil Procedure.

[3]Mary English died on November 24, 1978, while this appeal was pending. By stipulation, American Bank and Trust Company, special administrator of her estate, has been substituted as plaintiff in this action. For convenience, we shall use the term "plaintiff" to refer both to Mary English and to the present representative of her interest.

she was totally disabled for four months and partially disabled for two more months. Intermittent breakdown and blistering of the healed tissues continued to occur.

Alleging that defendant's negligence had led to her fall in the shower and to her severe burns, plaintiff brought the present action to recover for the resulting damages. At the time of trial, some 14 months after the accident, plaintiff still suffered residual disability caused by recurring blisters, and scarring in three of the four burn areas had resulted in a permanent cosmetic deformity. Plaintiff's doctor testified that it was reasonably probable that future surgery would be required, and that such surgery would be followed by periods of total and partial disability to permit proper healing. Plaintiff testified that she had not been able to work in 1977, the year following the accident, that she did not anticipate returning to work in 1978 because the condition of her left knee and leg prevented her from driving a car, and that if future surgery were recommended she "would certainly do it."

At the conclusion of the trial, the jury rendered a general verdict for $198,069.88 in favor of plaintiff. After the verdict was returned, defendant raised the periodic payment issue for the first time, moving for an order of periodic payment of future damages pursuant to section 667.7. The trial court, while concluding that the section was by its terms applicable, denied defendant's motion on the ground that the provision was unconstitutional. The court relied on two theories: (1) it concluded that the provision denies equal protection by granting a privilege to health care defendants that is not afforded to other defendants, and (2) it held that the provision denies due process to the spouse of an injured plaintiff by limiting the damages that a defendant is obligated to pay in the event of the plaintiff's death. In light of its constitutional ruling, the trial court entered a lump sum judgment in favor of plaintiff in the amount of the verdict.

Defendant now appeals from the judgment,[4] contending primarily that the trial court's constitutional rulings with respect to section 667.7 are in error.[5]

---

[4]Defendant also purports to appeal from the trial court's order, prior to judgment, denying the motion for periodic payments. Though reviewable on appeal from the judgment, that order itself is nonappealable. (§ 904.1; see generally 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, §§ 34, 62, 68, pp. 4048-4049, 4077, 4082-4083.) Accordingly, the purported appeal from that order must be dismissed.

[5]Defendant raises two additional claims on appeal. First, defendant asserts that the trial court erred in failing to reduce the judgment by $2,023.04, pursuant to a stipulation of the parties with respect to Medi-Cal payments received by plaintiff. Plaintiff concedes that the parties entered into such a stipulation, but suggests that the stipulated reduction was for $2,500, rather than the lower figure cited by defendant. Because the record is ambiguous on the amount of the stipulation, we shall direct the trial court, on remand, to determine the

In response, plaintiff claims that the provision is unconstitutional both on the grounds relied on by the trial court and on additional grounds as well. Numerous amicus briefs have been filed on both sides of the case.

## II

At common law, a plaintiff who suffers bodily injury at the hands of a tortfeasor has traditionally been compensated for both past and future damages through a lump sum judgment, payable at the conclusion of the trial. (2 Harper & James, The Law of Torts (1956) § 25.2, p. 1303.) Over the past 30 years, however, several tort scholars—noting that lump sum awards are often dissipated by improvident expenditures or investments before the injured person actually incurs the future medical expenses or earning losses—have advocated the legislative adoption of a "periodic payment" procedure as a reform measure which would, in these commentators' view, benefit both plaintiffs and defendants. (See *id.*, at pp. 1303-1304; Keeton & O'Connell, Basic Protection for the Traffic Victim—A Blueprint for Reforming Automobile Insurance (1965) pp. 351-358; Henderson, *Periodic Payments of Bodily Injury Awards* (1980) 66 A.B.A.J. 734.) In the last decade, many states have enacted provisions authorizing the periodic payment of damages in a variety of tort fields,[6] and, in 1980, the National Conference of Commissioners on Uniform State Laws approved a "Model Periodic Payment of Judgments Act" embodying this revised approach to compensation for future tort damages.

Section 667.7—the provision at issue here—represents the Legislature's initial adoption of the periodic-payment-of-damages concept into California tort law. The section—set forth in full below[7]—provides generally that when

---

stipulated figure and to reduce the judgment by that amount.

Second, defendant contends that the damage award was excessive and that the trial court erred in denying its motion for a remittitur or a new trial with respect to damages. The Court of Appeal addressed and rejected this claim when the case was before it, and, for the reasons stated by that court, we also conclude that the contention lacks merit. (See *People v. Ford* (1981) 30 Cal.3d 209, 215-216 [178 Cal.Rptr. 196, 635 P.2d 1176].)

[6]See generally Elligett, *The Periodic Payment of Judgments* (1979) 46 Ins.Couns.J. 130.

[7]Section 667.7 provides: "(a) In any action for injury or damages against a provider of health care services, a superior court shall, at the request of either party, enter a judgment ordering that money damages or its equivalent for future damages of the judgment creditor be paid in whole or in part by periodic payments rather than by a lump-sum payment if the award equals or exceeds fifty thousand dollars ($50,000) in future damages. In entering a judgment ordering the payment of future damages by periodic payments, the court shall make a specific finding as to the dollar amount of periodic payments which will compensate the judgment creditor for such future damages. As a condition to authorizing periodic payments of future damages, the court shall require the judgment debtor who is not adequately insured to post security adequate to assure full payment of such damages awarded by the judgment. Upon termination of periodic payments of future damages, the court shall order

a plaintiff in a medical malpractice action obtains an award of $50,000 or more for "future damages," the trial court, on motion of either party, shall enter a judgment providing for the periodic payment of those damages.

---

the return of this security, or so much as remains, to the judgment debtor.

"(b)(1) The judgment ordering the payment of future damages by periodic payments shall specify the recipient or recipients of the payments, the dollar amount of the payments, the interval between payments, and the number of payments or the period of time over which payments shall be made. Such payments shall only be subject to modification in the event of the death of the judgment creditor.

"(2) In the event that the court finds that the judgment debtor has exhibited a continuing pattern of failing to make the payments as specified in paragraph (1), the court shall find the judgment debtor in contempt of court and, in addition to the required periodic payments, shall order the judgment debtor to pay the judgment creditor all damages caused by the failure to make such periodic payments, including court costs and attorney's fees.

"(c) However, money damages awarded for loss of future earnings shall not be reduced or payments terminated by reason of the death of the judgment creditor, but shall be paid to persons to whom the judgment creditor owed a duty of support, as provided by law, immediately prior to his death. In such cases the court which rendered the original judgment, may, upon petition of any party in interest, modify the judgment to award and apportion the unpaid future damages in accordance with this subdivision.

"(d) Following the occurrence or expiration of all obligations specified in the periodic payment judgment, any obligation of the judgment debtor to make further payments shall cease and any security given, pursuant to subdivision (a) shall revert to the judgment debtor.

"(e) As used in this section:

"(1) 'Future damages' includes damages for future medical treatment, care or custody, loss of future earnings, loss of bodily function, or future pain and suffering of the judgment creditor.

"(2) 'Periodic payments' means the payment of money or delivery of other property to the judgment creditor at regular intervals.

"(3) 'Health care provider' means any person licensed or certified pursuant to Division 2 (commencing with Section 500) of the Business and Professions Code, or licensed pursuant to the Osteopathic Initiative Act, or the Chiropractic Initiative Act, or licensed pursuant to Chapter 2.5 (commencing with Section 1440) of Division 2 of the Health and Safety Code; and any clinic, health dispensary, or health facility, licensed pursuant to Division 2 (commencing with Section 1200) of the Health and Safety Code. 'Health care provider' includes the legal representatives of a health care provider.

"(4) 'Professional negligence' means a negligent act or omission to act by a health care provider in the rendering of professional services, which act or omission is the proximate cause of a personal injury or wrongful death, provided that such services are within the scope of services for which the provider is licensed and which are not within any restriction imposed by the licensing agency or licensed hospital.

"(f) It is the intent of the Legislature in enacting this section to authorize the entry of judgments in malpractice actions against health care providers which provide for the payment of future damages through periodic payments rather than lump-sum payments. By authorizing periodic payment judgments, it is the further intent of the Legislature that the courts will utilize such judgments to provide compensation sufficient to meet the needs of an injured plaintiff and those persons who are dependent on the plaintiff for whatever period is necessary while eliminating the potential windfall from a lump-sum recovery which was intended to provide for the care of an injured plaintiff over an extended period who then dies shortly after the judgment is paid, leaving the balance of the judgment award to persons and purposes for which it was not intended. It is also the intent of the Legislature that all elements of the periodic payment program be specified with certainty in the judgment ordering such payments and that the judgment not be subject to modification at some future time which might alter the specifications of the original judgment."

Explaining that the legislative intent is that "courts will utilize such judgments to provide compensation sufficient to meet the needs of an injured plaintiff and those persons who are dependent on the plaintiff for whatever period is necessary while eliminating the potential windfall from a lump-sum recovery which was intended to provide for the care of an injured plaintiff over an extended period who then dies shortly after the judgment is paid" (§ 667.7, subd. (f)), the section provides (1) that the judgment shall specify, inter alia, the dollar amount of the individual payments, the interval between payments and the period of time over which the payments shall be made (*id.*, subd. (b)(1)), (2) that the payment schedule shall be modifiable only if the plaintiff dies before all payments are due (*ibid.*),[8] and (3) that even if the plaintiff does die, the portion of future damages awarded for the plaintiff's loss of future earnings shall not be reduced or terminated but shall be paid to persons to whom the plaintiff owed a duty of support at the time of his or her death. (*Id.*, subd. (c).)

As noted above, plaintiff—and amici appearing on plaintiff's behalf—contend that this periodic payment provision violates a number of constitutional guarantees. We turn first to the most fundamental challenge, the contention that the change from a lump sum judgment to a periodic payment procedure violates due process.

### III

■ Plaintiff's due process claim rests initially on the contention that the change from a lump sum judgment to a periodic payment procedure violates the due process rights of medical malpractice victims by diminishing the value of their malpractice actions without providing them an adequate "quid pro quo." Although defendant—and supporting amici—strenuously contest plaintiff's factual assertion and maintain that the periodic payment provision itself, and MICRA in general, do in fact afford malpractice victims a substantial quid pro quo, settled constitutional principles teach that it is both unnecessary and inappropriate for us to attempt to balance the relative benefits and detriments of the legislation—i.e., the "adequacy" of the quid pro quo—in determining its validity under the due process clause. ■ It is well established that a plaintiff has no vested property right in a particular measure of damages, and that the Legislature possesses broad authority to modify the scope and nature of such damages. (See, e.g., *Werner v. Southern Cal. etc. Newspapers* (1950) 35 Cal.2d 121, 129 [216 P.2d

---

[8]Although the statute does not expressly provide what modification should follow the plaintiff's death, in context it is evident that the Legislature contemplated that a defendant's continuing liability for future damages other than damages for loss of future earnings would be subject to termination on the plaintiff's death. (See § 667.7, subds. (b)(1), (c), (f).)

825, 13 A.L.R.2d 252]; *Feckenscher* v. *Gamble* (1938) 12 Cal.2d 482, 499-500 [85 P.2d 885]; *Tulley* v. *Tranor* (1878) 53 Cal. 274, 280.) Since the demise of the substantive due process analysis of *Lochner* v. *New York* (1905) 198 U.S. 45 [49 L.Ed. 937, 25 S.Ct. 539], it has been clear that the constitutionality of measures affecting such economic rights under the due process clause does not depend on a judicial assessment of the justifications for the legislation or of the wisdom or fairness of the enactment. So long as the measure is rationally related to a legitimate state interest, policy determinations as to the need for, and desirability of, the enactment are for the Legislature.

██    Here, there can be no serious question but that the provision is rationally related to a legitimate state interest. Clearly, the Legislature could conclude that a procedure that provides for the periodic payment of future damages will further the fundamental goal of matching losses with compensation by helping to ensure that money paid to an injured plaintiff will in fact be available when the plaintiff incurs the anticipated expenses or losses in the future. In addition, the Legislature could legitimately determine that the public interest would be served by limiting a defendant's obligation to those future damages that a plaintiff actually incurs, eliminating the so-called "windfall" obtained by a plaintiff's heirs when they inherit a portion of a lump sum judgment that was intended to compensate the injured person for losses he in fact never sustained. Although reasonable persons may disagree as to the wisdom of a periodic payment approach in general, or with the merits of the particular procedure which the Legislature chose to adopt, the provision is obviously not irrational.[9]

██    Plaintiff alternatively argues that section 667.7 violates the due process rights of a malpractice victim's spouse by authorizing the termination of a portion of the future damage award on the death of the plaintiff. As noted above, the trial court accepted this argument, apparently concluding that a spouse has a vested community property right in the full amount of the damages found by the jury. Any rights which a surviving spouse may have in a personal injury judgment under the community property statutes, however, are obviously contingent on the nature of the judgment and on the measure of damages which the state has authorized for such a cause of action. Just as the injured victim has no vested right in a particular measure

---

[9]Although the dissent suggests that any periodic payment procedure requires a special "prescience" in anticipating future damages (*post,* p. 379), the reality is that in fashioning lump sum awards, juries have always been required to predict future losses on the basis of many variables, including inflationary trends—and then to reduce anticipated losses to present value. (See, e.g., *Rodriguez* v. *McDonnell Douglas Corp.* (1978) 87 Cal.App.3d 626, 660-662 [151 Cal.Rptr. 399].)

of damages, the spouse similarly has no such vested right. In short, the spouse clearly has no greater constitutional right than the victim to a damage award that continues beyond the victim's life.

## IV

Plaintiff next contends that even if the adoption of a periodic payment procedure is consistent with due process, section 667.7 is nonetheless unconstitutional as a denial of equal protection. As we have seen, the trial court upheld this claim, concluding that the statute is invalid because it provides a "special benefit" to one class of negligent tortfeasors—medical care providers—which is not afforded to other negligent tortfeasors. In a variant on this theme, plaintiff additionally maintains that the provision denies equal protection to persons injured by medical malpractice, withholding from this class the benefits of lump sum damage awards that are available to those who suffer negligently inflicted injury outside of the medical malpractice context. The gist of both arguments, of course, is that the Legislature acted unconstitutionally in limiting the operation of section 667.7 to medical malpractice cases.

The claim is by no means a novel one. In the mid-1970's, in reaction to medical malpractice crises throughout the country, virtually every state passed one or more statutory provisions to deal with the medical malpractice insurance problem. Although legislative solutions varied from state to state, in many jurisdictions the resulting enactments have been challenged, inter alia, as a violation of the federal equal protection clause or a related state constitutional provision, on the ground that they improperly single out medical malpractice litigants for differential treatment. The overwhelming majority of courts—both state and federal—which have spoken to the issue have emphatically rejected the contention.[10]

---

[10]The courts of 23 states and 3 federal circuits have rejected equal protection challenges in this setting. (See *Reese* v. *Rankin Fite Memorial Hospital* (Ala. 1981) 403 So.2d 158, 160-162; *Eastin* v. *Broomfield* (1977) 116 Ariz. 576 [570 P.2d 744, 750-751]; *Gay* v. *Rabon* (1983) 280 Ark. 5 [652 S.W.2d 836, 837-838]; *Lacy* v. *Green* (Del.Super. 1981) 428 A.2d 1171, 1177-1178; *Pinillos* v. *Cedars of Lebanon Hospital Corp.* (Fla. 1981) 403 So.2d 365, 367-368; *LePelley* v. *Grefenson* (1980) 101 Idaho 422 [614 P.2d 962, 967-968]; *Anderson* v. *Wagner* (1979) 79 Ill.2d 295 [402 N.E.2d 560, 570-571]; *Johnson* v. *St. Vincent Hospital, Inc.* (1980) 273 Ind. 374 404 N.E.2d 585, 600-601; *Rudolph* v. *Iowa Methodist Medical Ctr.* (Iowa 1980) 293 N.W.2d 550, 557-559; *Stephens* v. *Snyder Clinic Ass'n* (1981) 230 Kan. 115 [631 P.2d 222, 233-236]; *Everett* v. *Goldman* (La. 1978) 359 So.2d 1256, 1265-1267; *Attorney General* v. *Johnson* (1978) 282 Md. 274 [385 A.2d 57, 76-80], app. dis. 439 U.S. 805 [58 L.Ed.2d 97, 99 S.Ct. 60]; *Paro* v. *Longwood Hospital* (1977) 373 Mass. 645 [369 N.E.2d 985, 987-989]; *Linder* v. *C.W. Smith, M.D.* (Mont. 1981) 629 P.2d 1187, 1192-1193; *Prendergast* v. *Nelson* (1977) 199 Neb. 97 [256 N.W.2d 657, 667-669]; *Perna* v. *Pirozzi* (1983) 92 N.J. 446 [457 A.2d 431, 437]; *Armijo* v. *Tandysh* (Ct.App. 1981) 98 N.M. 181 [646 P.2d 1245, 1247]; *Comiskey* v. *Arlen* (1976) 55 App.Div.2d 304 [390 N.Y.S.2d 122, 129-130]; *Roberts* v. *Durham County Hospital Corp.* (1983) 56 N.C.App.

With respect to section 667.7, we too conclude that the equal protection claim is unfounded. It is true, of course, that a periodic payment of damages procedure could reasonably be applied across the entire tort spectrum; as already noted, there have been a variety of proposals advocating just such a general reform. Countless constitutional precedents establish, however, that the equal protection clause does not prohibit a Legislature from implementing a reform measure "one step at a time" (*Williamson* v. *Lee Optical Co.* (1955) 348 U.S. 483, 489 [99 L.Ed. 563, 573, 75 S.Ct. 461]), or prevent it "from striking the evil where it is felt most." (*Werner* v. *Southern Cal. etc. Newspapers* (1950) 35 Cal.2d 121, 132 [216 P.2d 825, 13 A.L.R.2d 252].)

The reason the Legislature limited the application of section 667.7—and, indeed, MICRA in general—to the medical malpractice field was, of course, because it was responding to an insurance "crisis" that had arisen in a particular area. The problem which was the immediate impetus to the enactment of MICRA arose when the insurance companies which issued virtually all of the medical malpractice insurance policies in California determined that the costs of affording such coverage were so high that they would no longer continue to provide such coverage as they had in the past. Some of the insurers withdrew from the medical malpractice field entirely, while others raised the premiums which they charged to doctors and hospitals to what were frequently referred to as "skyrocketing" rates. As a consequence, many doctors decided either to stop providing medical care with respect to certain high risk procedures or treatment, to terminate their practice in this state altogether, or to "go bare," i.e., to practice without malpractice insurance. The result was that in parts of the state medical care was not fully available, and patients who were treated by uninsured doctors faced the prospect of obtaining only unenforceable judgments if they should suffer serious injury as a result of malpractice.

Many factors have been tendered to explain why these problems arose in the medical malpractice field—the changing doctor-patient relationship, a

---

533 [289 S.E.2d 875, 878-880], affd. (1983) 307 N.C. 465 [298 S.E.2d 384]; *Beatty* v. *Akron City Hospital* (1981) 67 Ohio St.2d 483 [424 N.E.2d 586, 591-595, 424 N.E.2d 586]; *Allen* v. *Intermountain Health Care, Inc.* (Utah 1981) 635 P.2d 30, 31-32; *Duffy* v. *King Chiropractic Clinic* (1977) 17 Wn.App. 693 [565 P.2d 435, 437]; *State* ex rel. *Strykowski* v. *Wilkie* (1978) 81 Wis.2d 491 [261 N.W.2d 434, 441-444]; *Woods* v. *Holy Cross Hospital* (5th Cir. 1979) 591 F.2d 1164, 1171-1175; *DiAntonio* v. *Northampton-Accomack Memorial* (4th Cir. 1980) 628 F.2d 287, 291-292; *Fitz* v. *Dolyak* (8th Cir. 1983) 712 F.2d 330, 332-333.)

Three state courts have reached a contrary conclusion. (See *Carson* v. *Maurer* (1980) 120 N.H. 925 [424 A.2d 825, 830-839, 12 A.L.R.4th]; *Arneson* v. *Olson* (N.D. 1978) 270 N.W.2d 125, 131-136; *Boucher* v. *Sayeed* (R.I. 1983) 459 A.2d 87, 91-94.)

rapid "liberalization" of tort doctrine in medical malpractice cases, a uniquely small number of insureds over which to spread premiums, imprudent investments on the part of medical malpractice insurers, and others. (See generally Keene, *California's Medical Malpractice Crisis* in A Legislator's Guide to the Medical Malpractice Issue (1976) 27, 27-28.) Plaintiff— and supporting amici—challenge the factual accuracy of some of these explanations and invite us to determine the "true" cause of the medical malpractice insurance problems that preceded MICRA and even to second-guess the Legislature as to whether a "crisis" actually existed.[11] ■ It is not the judiciary's function, however, to reweigh the "legislative facts" underlying a legislative enactment. (See, e.g., *Minnesota v. Cloverleaf Creamery Co.* (1981) 449 U.S. 456, 464 [66 L.Ed.2d 659, 668-669, 101 S.Ct. 715] ["states are not required to convince the courts of the correctness of their legislative judgments . . ."].) Whatever the reasons for the medical malpractice insurance problems, it is clear that the Legislature—which thoroughly investigated this matter through numerous hearings, audits and the like—could rationally conclude from the information before it that the high insurance costs in this particular area posed special problems with respect to the continued availability of adequate insurance coverage and adequate medical care and could fashion remedies—directed to the medical malpractice context—to meet these problems.

Section 667.7 is one of a number of provisions of MICRA which was intended, in part, to reduce the cost of medical malpractice insurance. By reducing such costs, the Legislature hoped (1) to restore insurance premiums to a level doctors and hospitals could afford, thereby inducing them to resume providing medical care to all segments of the community, and (2) to insure that insurance would in fact be available as a protection for patients injured through medical malpractice.

Plaintiff does not—and could not—claim that section 667.7's periodic payment provisions are not rationally related to the objective of reducing insurance costs. As the legislative history of MICRA indicates, one of the factors which contributed to the high cost of malpractice insurance was the need for insurance companies to retain large reserves to pay out sizeable

---

[11]The preamble to MICRA states: "The Legislature finds and declares that there is a major health care crisis in the State of California attributable to skyrocketing malpractice premium costs and resulting in a potential breakdown of the health delivery system, severe hardships for the medically indigent, a denial of access for the economically marginal, and depletion of physicians such as to substantially worsen the quality of health care available to citizens of this state. The Legislature, acting within the scope of its police powers, finds the statutory remedy herein provided is intended to provide an adequate and reasonable remedy within the limits of what the foregoing public health safety considerations permit now and into the foreseeable future." (Stats. 1975, Second Ex. Sess. 1975-1976, ch. 2, § 12.5, p. 4007.)

lump sum awards. The adoption of a periodic payment procedure permits insurers to retain fewer liquid reserves and to increase investments, thereby reducing the costs to insurers and, in turn, to insureds. In addition, the portion of section 667.7 which provides for the termination of a significant portion of the remaining future damage payments in the event of the plaintiff's death is obviously related to the goal of reducing insurance costs.

Thus, since there was a rational and legitimate basis for the Legislature's decision to attempt to reduce insurance costs in the medical malpractice area and since the provisions of section 667.7 are rationally related to that objective, the Legislature did not violate equal protection principles in limiting section 667.7's application to medical malpractice actions.[12]

A number of amici, theorizing that the primary purpose of MICRA was to contain the *overall* costs of medical care, contend that section 667.7—and, by logical inference, all of MICRA—should be held unconstitutional on the basis of statistics which indicate that the overall costs of medical and hospital care rose considerably in the years since MICRA's enactment. This contention is riddled with fundamental flaws. First, the legislative history of MICRA does not suggest that the Legislature intended to hold down the overall costs of medical care but instead demonstrates—as we have explained—that the Legislature hoped to reduce the cost of medical malpractice insurance, so that doctors would obtain insurance for all medical procedures and would resume full practice; indeed, in this respect amici's statistics suggest that MICRA was in fact successful. The statistical information before the Legislature indicated, however, that insurance costs amounted to only a small percentage of overall medical costs (see, e.g., Assem. Select Com. on Medical Malpractice Preliminary Rep. (June 1974) p. 49), and thus in an era of substantial inflation—as experienced in the late 1970's—even the total elimination of malpractice insurance premiums could not reasonably have been expected to reduce the overall cost of medical care.

Second, the rise in medical and hospital costs cannot, in any event, properly be attributed to a failure of section 667.7, since the section has never fully been implemented. The trial court's decision in this case was apparently the first judicial ruling on the question, and in view of its finding of

---

[12]Although several amici urge the court to apply a stricter standard of review, the governing authorities—both federal and state—establish that the traditional "rational relationship" standard is applicable here. (See, e.g., *Duke Power Co.* v. *Carolina Env. Study Group* (1978) 438 U.S. 59, 93-94 [57 L.Ed.2d 595, 624-625, 98 S.Ct. 2620]; *Cory* v. *Shierloh* (1981) 29 Cal.3d 430, 438-439 [174 Cal.Rptr. 500, 629 P.2d 8]; *Brown* v. *Merlo* (1973) 8 Cal.3d 855, 862, fn. 2 [506 P.2d 212, 66 A.L.R.2d 505].)

unconstitutionality, the periodic payment procedure has not been widely enforced. Thus amici's statistics do not shed any light on the effectiveness of the statutory reform.

■ Finally, and most fundamentally, the constitutionality of a measure under the equal protection clause does not depend on a court's assessment of the empirical success or failure of the measure's provisions. As Justice Brennan explained recently in *Minnesota v. Cloverleaf Creamery Co., supra,* 449 U.S. 456, 466 [66 L.Ed.2d 659, 670]: "Whether *in fact* the Act will promote [the legislative objectives] is not the question: the Equal Protection Clause is satisfied by our conclusion that the [state] Legislature *could rationally have decided* that [it] . . . might [do so] . . . ." (Original italics.) As we have explained, there can be no question but that—from the information before it—the Legislature could rationally have decided that the enactment might serve its insurance cost reduction objective. Amici's argument is misguided.

■ In addition to challenging the disparate treatment between medical malpractice victims and other victims of negligently inflicted injury, plaintiff also attacks the provisions of section 667.7 which limit the periodic payment procedure to those malpractice victims with future damages of $50,000 or more. The Legislature adopted the $50,000 threshold based on a determination that the administrative costs involved in the implementation of a periodic payment award would mean that such a procedure would not be cost efficient for smaller future damage claims. The Legislature has broad leeway in making these kinds of economic "line-drawing" determinations, and the "classification" resulting from the $50,000 threshold certainly has a rational basis.

Accordingly, we conclude that section 667.7 does not deny equal protection.

V

Plaintiff's next contention relates to section 667.7's impact on the constitutional right to jury trial. (Cal. Const., art. I, § 16.)

As enacted, section 667.7 is somewhat ambiguous on the precise roles which the Legislature contemplated that the jury and court would play in the formulation of a periodic payment judgment. On the one hand, it is apparent from the statute (1) that *the jury* remains the ultimate decision-maker of the plaintiff's "total damages," and (2) that *the court* is to fashion the specific details of the periodic payment award, designating the dollar

amount of the payments, the interval between payments and the period of time over which the payments are to be made. (§ 667.7, subd. (b)(1).) On the other hand, however, the statute does not make clear whether it is the jury or the court which is to determine the amount of the "future damages" component of the overall award.[13]

Plaintiff contends that the jury trial guarantee requires that the jury not only fix the amount of future damages but also that it make special findings on any subsidiary issue that may affect the structuring of a periodic payment schedule. Defendant takes the position that the jury's only role is to establish total damages, and that thereafter it is the court that both determines the amount attributable to future damages and establishes the periodic payment schedule. Defendant maintains that the court's authority under its proposed interpretation does not infringe the right to jury trial.

Our prior decisions provide only limited guidance on the constitutional jury trial question. Although a number of cases have defined the constitutional jury trial right as essentially that existing at common law at the time the Constitution was adopted (see, e.g., *People* v. *One 1941 Chevrolet Coupe* (1951) 37 Cal.2d 283 [231 P.2d 832]; *Southern Pac. Transportation Co.* v. *Superior Court* (1976) 58 Cal.App.3d 433, 436 [129 Cal.Rptr. 912]), in *Jehl* v. *Southern Pac. Co.* (1967) 66 Cal.2d 821 [59 Cal.Rptr. 276, 427 P.2d 988], in a unanimous opinion authored by Chief Justice Traynor, we upheld the validity of the additur procedure—a device unknown at common law—explaining that the constitutional provision " 'does not require adherence to the letter of common law practice, and new procedures better suited to the efficient administration of justice may be substituted *if there is no*

---

[13]Defendant contends that the language and legislative history of section 667.7 demonstrate that the Legislature intended the court to make this determination. Defendant relies on the fact that an earlier version of the bill that was ultimately enacted as MICRA provided, in part, that "[i]n entering a judgment ordering the payment of future damages, *the jury or the court*, in the event the trial is without a jury, shall make a specific finding as to the dollar amount of periodic payments which will compensate the judgment creditor for such future damages" (Assem. Bill No. 1, as amended June 6, 1975, 13 Assem.J. (1975-1976 Second Ex. Sess.) p. 60) (italics added), but that, as enacted, this language was amended to delete any reference to the jury and to provide simply that the court shall make the specified finding. (§ 667.7, subd. (a).) As plaintiff points out, however, the initial sentence of section 667.7 provides simply that a periodic payment judgment is to be ordered "if the award equals or exceeds fifty thousand dollars ($50,000) in future damages," suggesting that the amount attributable to future damages will be determined as part of the overall determination of "the award," and the following sentence of section 667.7—the sentence on which defendant relies—is not necessarily inconsistent with such an interpretation for it defines the court's role as making "a specific finding as to the dollar amount of periodic payments which will compensate . . . for *such* future damages" (italics added), implying that the amount of "such" damages has been independently designated. Thus, we find the statute ambiguous on this point.

*impairment of the substantial features of a jury trial.'* . . . The guarantee of jury trial in the California Constitution operates at the time of trial to require submission of certain issues to the jury. Once a verdict has been returned, however, the effect of the constitutional provision is to prohibit *improper interference* with the jury's decision." (*Id.*, at pp. 828-829.) (Italics added.)

Because tort judgments were not subject to periodic payment at common law, an historical perspective provides *no direct guidance in determining* the permissible roles of court and jury in implementing a periodic payment procedure. Thus, the constitutional question before us is basically whether defendant's proposed interpretation of the statute—authorizing the trial court to fix the amount of future damages subject to periodic payment— amounts to an impermissible "impairment of the substantial features of a jury trial" or to an "improper interference with the jury's decision." ▮ Neither party has cited any authority closely in point, but in light of the familiar principle that a statute should be construed to avoid all doubts as to its constitutionality (*United States* ex rel. *Atty. Gen.* v. *Delaware & Hudson Co.* (1909) 213 U.S. 366, 407-408 [53 L.Ed. 836, 848-849, 29 S.Ct. 527]), we conclude that section 667.7 should be interpreted to require the jury to designate the portion of its verdict that is intended to compensate the plaintiff for future damages. Under section 667.7's procedure, this "future damage" figure plays a number of crucial roles: (1) it identifies the amount that the jury has determined as attributable to past and present damages, an amount which the plaintiff will be entitled to receive in an immediate lump sum payment at the time of judgment, and (2) it determines whether the periodic payment procedure will be applicable to the case or not—depending on whether future damages are found to equal or exceed $50,000. If the finding on the amount of future damages were left solely to the court, the court might seriously underestimate the award which the jury intended as compensation for losses which the plaintiff has already incurred, thereby significantly undermining the statutory purpose of affording a fair correlation between the sustaining of losses and the payment of damages.

Once the jury has designated the amount of future damages—and has thus identified the amount of damages subject to periodic payment—we believe that the court's authority under section 667.7, subdivision (b)(1), to fashion the details of a periodic payment schedule does not infringe the constitutional right to jury trial. As defendant notes, the court's function in this regard is similar to the authority long exercised by courts in the disbursement of the proceeds of a judgment under a number of well-established statutory schemes. (See, e.g., § 377 [court apportionment of wrongful death recovery among individual heirs]; Prob. Code, §§ 3600-3603 [court control

over disbursement of proceeds of judgment in favor of minors and incompetent persons].) Plaintiff cites no decision to support the contention that the exercise of such limited judicial authority is incompatible with the jury trial guarantee, and the additur procedure—upheld in *Jehl, supra,* 66 Cal.2d 821—affords a court considerably greater latitude in fixing the plaintiff's ultimate damage recovery.

Thus, we conclude that when section 667.7 is interpreted to require the jury to designate the amount of future damages which is subject to periodic payment, the section does not conflict with the constitutional right to jury trial.

## VI

Finally, plaintiff contends that even if section 667.7 can be construed to eliminate any right-to-jury-trial problem, the provision should still be struck down as unconstitutionally "void for vagueness, ambiguity and unworkability," because it leaves unanswered many questions as to how a trial court is to actually formulate a comprehensive payment schedule without the benefit of very detailed special jury verdicts. In structuring a periodic payment schedule in light of the statutory objective of "provid[ing] compensation sufficient to meet the needs of an injured plaintiff . . . for whatever period is necessary" (§ 667.7, subd. (f)), a court will, of course, necessarily be guided by the evidence of future damages introduced at trial, and the difficulty of the court's task will thus inevitably vary with the nature of the future damages involved in a given case. ■ There is nothing in section 667.7, however, which precludes resort to the special verdict procedure of section 625, and—particularly when the elements of future damage are in dispute—we think trial courts would be well advised to permit liberal use of the special verdict procedure so that the individual components of the jury's future damage award can be ascertained and the periodic payment schedule can be knowledgeably established.[14] As in the comparative negligence field (see *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804, 824 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393]), we believe that reliance on the special verdict procedure "can be of invaluable assistance" (*ibid.*) to the court in this realm.

---

[14]Although the scope of the special verdicts will necessarily vary with the evidence presented in a particular case, we believe that it would generally be wise to have the jury designate the portion of the future damage award which is intended to compensate the plaintiff for loss of future earnings. This figure will become of crucial importance in the event that the plaintiff dies before the judgment is fully paid, because section 667.7, subdivision (c) provides that damages for future earnings—unlike the other components of future damages—must continue to be paid to a plaintiff's dependents after the plaintiff's death.

In any event, plaintiff provides no authority to support its claim that the remaining uncertainties which may inhere in the statute provide a proper basis for striking it down on its face. As with other innovative procedures and doctrines—for example, comparative negligence—in the first instance trial courts will deal with novel problems that arise in time-honored case-by-case fashion, and appellate courts will remain available to aid in the familiar common law task of filling in the gaps in the statutory scheme. (Cf. *Li* v. *Yellow Cab Co.*, *supra*, 13 Cal.3d at pp. 826-827.)

## VII

The question remains as to the proper disposition of this case. As noted at the outset, defendant did not raise the matter of periodic payments until after the jury had returned its verdict. As a consequence, the jury made no finding as to the amount of future damages and plaintiff was deprived of the opportunity to seek additional special verdicts to guide the structuring of a periodic payment schedule. Because plaintiff has died in the interim (see fn. 3, *ante*), granting a new trial at this point obviously would not restore the status quo ante. Although it is impossible to determine with certainty how the jury would have apportioned the damages or how the court would have scheduled payments, the evidence at trial did indicate that plaintiff had a short life expectancy. Thus, it seems reasonable to assume that at least the bulk of the damages would have been attributed either to past damages or to the period of time which plaintiff survived. Under these circumstances, we conclude that the interests of justice would be best served by upholding the trial court's lump sum award.

The appeal from the order denying the motion for periodic payments is dismissed. (See fn. 4, *ante*.) On remand, the trial court shall reduce the judgment in accordance with the stipulation of the parties. (See fn. 5, *ante*.) In all other respects, the judgment is affirmed. Each party shall bear its own costs on appeal.

Broussard, J., Grodin, J., and Feinberg, J.,* concurred.

**MOSK, J.**—I dissent. This imprudent legislation provides benefits to the wrongdoer at the expense of his victim.

First, I disagree with the majority's view that the detrimental effect of Code of Civil Procedure section 667.7 on malpractice victims is irrelevant to a determination of unconstitutionality. Second, while I concur with the

---

*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.

majority that the rational relationship test is the appropriate standard to apply in evaluating the challenge to MICRA on equal protection grounds, I disagree with its conclusion as to the purpose of the legislation, and with the failure to consider certain statistical information in deciding the equal protection issue.

It is true, as the majority hold, that the Legislature is not required to provide a quid pro quo as a condition of diminishing the common law rights of tort victims. However, consideration of the detrimental effect of legislation on a disadvantaged class is not irrelevant to a determination of whether the members of the class have been deprived of due process of law. A number of cases, in passing on the constitutionality of statutes imposing disabilities on certain categories of tort victims, have relied on the presence or absence of a quid pro quo to the detrimentally affected class as a factor in their determinations. (See, e.g., *Duke Power Co.* v. *Carolina Env. Study Group* (1978) 438 U.S. 59, 93 [57 L.Ed.2d 595, 623, 98 S.Ct. 2620]; *New York Central R.R. Co.* v. *White* (1917) 243 U.S. 188, 201 [61 L.Ed. 667, 674, 37 S.Ct. 247]; *Hurst* v. *Triad Shipping Co.* (3d Cir. 1977) 554 F.2d 1237, 1243-1244; see also *Carr* v. *United States* (4th Cir. 1970) 422 F.2d 1007, 1011; Learner, *Medical Malpractice* (1981) 18 Harv.J.Legis. 143.) Indeed, the absence of quid pro quo to malpractice victims was held to render unconstitutional a monetary limit on the amount of recovery (*Wright* v. *Central DuPage Hospital Association* (1976) 63 Ill.2d 313 [347 N.E.2d 736, 742-743, 80 A.L.R.3d 566]) and a statute of limitations applicable only to malpractice victims who are minors (*Sax* v. *Votteler* (Tex. 1983) 648 S.W.2d 661, 667.)

Although the hospital claims that periodic payments are fair to the malpractice victim because damages are paid out as they are incurred, this assumes that a court, in structuring payments for future damages, will be prescient enough to predict with unerring accuracy the future condition of the plaintiff and the rate of inflation for perhaps decades into the future. If the victim's condition deteriorates so that medical treatment or custodial care costs more than the amount set forth in the schedule of payments, he is unable to obtain the additional sums required because the payment schedule is fixed. Even if his condition remains as predicted, it is impossible to foresee in advance the rate at which future medical costs will increase. For a number of years, such costs have been rising at a pace substantially higher than the general inflation rate. (Health United States—1981 (U.S. Dept. of Health & Human Services, Pub. Health Service, Office of Health Research, Statistics & Technology) p. 83.)

By depriving a malpractice victim of access to the whole amount of the judgment awarded by the trier of fact and the benefits from its investment,

section 667.7 places upon him the entire risk that unpredictable future consequences of his injury will render the periodic payments inadequate to meet his needs. This problem is alleviated for the victims of every tort except medical malpractice; all other prevailing plaintiffs may use the entire amount awarded by the judgment and the earnings therefrom as needed.

While subdivision (f) of section 667.7 eliminates the possibility that the heirs of a malpractice victim would obtain a "windfall" if there were funds awarded by the judgment remaining at the time of his death, the availability of such funds may well be due to the fact that the statute has prevented the victim from using the entire amount of the judgment as his needs require. Under the statute, the sums retained by the insurer are those which would have provided a financial safety valve to the victim for unexpected expenses connected with his injury during the course of his life. Thus, it is the insurer for the wrongdoer which obtains a windfall under the statute, by retaining some—perhaps in some instances most—of the funds which the judgment has awarded to the victim.

Of course, the periodic payment arrangement prevents dissipation of the funds awarded to the victim of the malpractice so that continued compensation is assured. However, the injured party who receives payment in full may also assure a continued income by purchasing an annuity and he may, in addition, derive growth and flexibility by acquiring liquid, income-producing investments with some of the funds awarded.

In short, section 667.7 provides a wrongdoer in a malpractice action with substantial advantages without compensating advantages to his victim.

Next, I disagree with the majority's explanation as to the purposes underlying this unfair distribution of burdens and benefits. The major thrust of the majority's opinion appears to be that the "fundamental goal" of section 667.7 is to "ensure that money paid to an injured plaintiff will in fact be available" when he incurs future expenses and to prevent a "windfall" to heirs of a malpractice victim who dies before his lump-sum award is exhausted. (Maj. opn., *ante* at p. 369.) According to the majority, the so-called "malpractice crisis" merely provided the "immediate impetus" for the initial application of this general reform to malpractice victims. (Maj. opn., *ante* at p. 371.) This approach turns the purpose of section 667.7 on its head. Neither the Governor's proclamation calling the Legislature into special session, nor the preamble to the measure mention these goals as a justification for MICRA. While the majority cites various commentators and other authorities for the proposition that such reforms may be desirable, there is no indication that the Legislature itself viewed the

premature dissipation of amounts recovered by tort plaintiffs or a possible "windfall" to their heirs as a general problem which the Legislature was meeting by adopting a "piecemeal" solution.

Almost all of the decisions which have upheld the constitutionality of legislation diminishing the rights of malpractice victims have justified the legislation on the ground that its purpose was to alleviate a "malpractice crisis," and some decisions which have invalidated malpractice reforms have done so because they concluded that such a crisis did not exist. (*Arneson* v. *Olson* (N.D. 1978) 270 N.W.2d 125, 136; *Boucher* v. *Sayeed* (1983) — R.I. — [459 A.2d 87, 93], see *Jones* v. *State Board of Medicine* (1976) 97 Idaho 859 [555 P.2d 399, 412-416].)

A second reason advanced by the majority as justification for the classification made in section 667.7 is that it was intended to reduce the cost of premiums for malpractice insurance, thereby inducing doctors who had withdrawn their services because of the rise in premiums to resume practice, and to encourage doctors to carry malpractice insurance. (Maj. opn., *ante* at p. 372.)

In my view, the purpose of MICRA, including section 667.7, was, instead, to lower malpractice premiums for the purpose of reducing or containing the cost of medical care to the public. A number of cases from other jurisdictions recognize this containment of overall medical costs as a main objective of legislation similar to MICRA. (See, e.g., *Gay* v. *Rabon* (1983) 280 Ark. 5 [652 S.W.2d 836, 838]; *Pinillos* v. *Cedars of Lebanon Hospital Corp.* (Fla. 1981) 403 So.2d 365, 367; *Everett* v. *Goldman* (La. 1978) 359 So.2d 1256, 1266; *Attorney General* v. *Johnson* (1978) 282 Md. 274 [385 A.2d 57, fn. 35 at pp. 78-79]; *Prendergast* v. *Nelson* (1977) 199 Neb. 97 [256 N.W.2d 657, 668]; *Beatty* v. *Akron City Hospital* (1981) 67 Ohio St.2d 483 [424 N.E.2d 586, 594]; *Allen* v. *Intermountain Health Care, Inc.* (Utah 1981) 635 P.2d 30, 32; *State* ex rel. *Strykowski* v. *Wilkie* (1978) 81 Wis.2d 491 [261 N.W.2d 434, 442].) This intent is implicit in the statement of the preamble that the health care crisis, with its resulting hardship to the "medically indigent" and the "economically marginal" is "attributable to skyrocketing medical malpractice premium costs," and in the statement in the Governor's proclamation that the inability of doctors to obtain such insurance at reasonable rates was endangering the health of the people and threatened the closing of many hospitals, a result which would seriously limit the health care available to hundreds of thousands of Californians. The withdrawal of some medical services and the threat that some doctors would not purchase malpractice insurance would not necessarily threaten the health of

the "medically indigent" or the "economically marginal," it seems to me, whereas a rise in the overall cost of medical care would pose such a threat.

The assumption made by the Legislature was that insurers could provide malpractice insurance at lower rates if they could save on the cost of providing such insurance, and that these lower premium rates would then be passed on to the public in the form of lower medical costs, or at least in the containment of such costs.

The assumption that there exists a significant relationship between the reduction in malpractice premiums and a meaningful containment of medical costs to the general public lies at the heart of MICRA. Yet, a comparison between the amount of such premiums and the cost of hospital care in the years following the enactment of the legislation demonstrates that this premise is erroneous.

According to amicus curiae, the California Hospital Association, in a study of the premiums paid by 420 of the state's 650 hospitals, the cost of malpractice insurance had risen dramatically before the enactment of MICRA, so that by October 1, 1976, the charge for $1 million in coverage for each occupied hospital bed was $124.31 a month, or roughly $4 a day. Premium charges were lower by 1981, amounting to only $93.46 a month for the same amount of coverage for each occupied bed, or approximately $3 a day.[1]

In 1975, the year MICRA was enacted, the average daily charge for hospitalization in a community hospital in California was $217 a day. (U.S. Dept. of Commerce, Statistical Abstract of the U.S., table No. 177, p. 111 (1981).) By 1981, the average hospital charge had risen to $547 daily, an increase of more than 20 percent over the previous year. (Cal. Health Facil. Com., Q. Fin. & Utilization Rep. No. 82-5, Aggregate Hospital Data, 4th Quarter 1981 (Apr. 15, 1982) at p. A-1.) Another increase of more than 20 percent occurred between the first quarter of 1981 and the first quarter of 1982, so that in the latter period, the average daily hospitalization charge

---

[1]Amicus explains that 420 of the 650 hospitals in California and the 6,000 doctors they employ are insured through an insurance exchange which furnishes the hospitals a claims service for a fee. The claims experience of these hospitals is directly reflected in the malpractice premiums paid by them, since any savings or losses are passed directly from the exchange to the affected hospitals. The hospitals which are not insured through the exchange are self-insured either by virtue of the fact that they are operated by the government or because they are insured by companies owned by the hospitals themselves. Commercial insurers have virtually abandoned the hospital insurance market in California since 1975.

amounted to $620. (*Id.*, Rep. No. 82-8, 1st Quarter 1982 (July 15, 1982) at p. A-1.)[2]

In short, while malpractice premiums for most of the state's hospitals declined by 25 percent in the years following enactment of MICRA, the cost of hospitalization rose dramatically. These spiraling costs are significant in assessing the total expense for medical care because hospital expenditures constitute more than 40 cents of every dollar spent on medical care, a far higher segment than any other component of the overall cost. (Health United States—1981 (U.S. Dept. of Health & Human Services, Pub. Health Service, Office of Health Research, Statistics & Technology) table No. 68, p. 203.)

We do not imply, of course, that the charge for malpractice premiums plays no part in the cost of hospitalization. It is obvious from the figures set forth above, however, that the cost effect of the former on the latter is negligible at best, and that experience since 1975 has demonstrated the fallacy of the Legislature's assumption that the reduction of malpractice premiums paid by hospitals would result in a meaningful containment of hospital costs.[3]

But, claims the majority, we are precluded from considering these matters because "the constitutionality of a measure under the equal protection clause does not depend on a court's assessment of the empirical success or failure of the measure's provisions." (Maj. opn., *ante* at p. 374.) It is true, nevertheless, that a number of cases have relied on events following enactment of a statute in holding that it violates equal protection or other constitutional principles because the assumption on which the legislation was premised has ceased to exist.

In *Brown* v. *Merlo* (1973) 8 Cal.3d 855, 869 [106 Cal.Rptr. 388, 506 P.2d 212, 66 A.L.R.3d 505], we held invalid as a denial of equal protection a statute which denied recovery to nonpaying automobile passengers against a negligent driver reasoning, in part, that although the statute might have

---

[2]These daily charges are based on a study of 552 hospitals, not including state hospitals, Kaiser Foundation hospitals, Shriners' hospitals, and dental hospitals. If these additional special facilities are considered, the average daily cost of hospitalization for the first quarter of 1982 would be $488 a day (*id.*, Rep. No. 82-8, 1st Quarter 1982 (July 15, 1982) at p. A-2), and for 1981 $431 a day (*id.*, Rep. No. 82-5, 4th Quarter 1981 (Apr. 15, 1982) at p. A-2).

[3]The majority opinion states at page 374 that section 667.7 has not been widely enforced because of doubts as to its constitutionality. Presumably, this applies to other provisions of MICRA as well. I find this observation inconsistent with the majority's prior statement that MICRA has been successful in reducing the cost of malpractice premiums.

been justified when it was enacted as rationally related to the protection of hosts from the "ingratitude" of their passengers, the widespread availability of liability insurance in later years eliminated this justification for the distinction between those passengers who were entitled to recover against a negligent driver and those who were not. The guest statute has been invalidated in other states on this basis. (See, e.g., *Thompson* v. *Hagan* (1974) 96 Idaho 19 [523 P.2d 1365, 1368-1369]; *Henry* v. *Bauder* (1974) 213 Kan. 751 [518 P.2d 362, 369-371]; *McGeehan* v. *Bunch* (1975) 88 N.M. 308 [540 P.2d 238, 242-244]; see also, *Johnson* v. *Hassett* (N.D. 1974) 217 N.W.2d 771, 779-780.)

The application of this principle is not confined to guest statutes. (E.g., *Milnot Company* v. *Richardson* (S.D.Ill. 1972) 350 F.Supp. 221, 224-225 [statute prohibiting interstate shipment of imitation milk and dairy products violated equal protection in view of changes in marketing conditions occurring after earlier decision of United States Supreme Court upholding constitutionality of statute]; *People* v. *McCabe* (1971) 49 Ill.2d 338 [275 N.E.2d 407, 409, 413, 50 A.L.R.3d 1149] [classification of marijuana under law providing for 10-year mandatory sentence violated equal protection in view of recent information regarding nature and effects of marijuana]; *State* v. *Anonymous* (1976) 32 Conn.Supp. 324 [355 A.2d 729, 732-733, 740-741] [classification of marijuana with certain dangerous drugs for penalty purposes violated equal protection on basis of "present state of knowledge" regarding properties of the drug].)

The rule that postenactment information may be considered in passing on the constitutionality of a statute has been invoked with respect to constitutional provisions other than equal protection. In a recent case, this court applied such reasoning to hold unconstitutional a statute challenged on the ground that it impaired the obligation of contracts in violation of the United States and California Constitutions. (*Sonoma County Organization of Public Employees* v. *County of Sonoma* (1979) 23 Cal.3d 296, 311 [152 Cal.Rptr. 903, 591 P.2d 1].) We observed that a law which depends on the existence of an emergency to uphold it may be invalid if the emergency ceases or if the facts have changed even though the law was valid when passed, that it is "always open to judicial inquiry whether the exigency still exists upon which the continued operation of the law depends," and that a court is not precluded from considering matters which occurred after enactment of the statute in order to decide whether later events render it invalid. (See also, *Leary* v. *United States* (1969) 395 U.S. 6, 38, 52-53 [23 L.Ed.2d 57, 83, 91, 89 S.Ct. 1532] [statutory presumption that users knew that marijuana was imported held irrational in part on basis of information developed following enactment]; *Chastelton Corp.* v. *Sinclair* (1924) 264 U.S. 543, 547-

548 [68 L.Ed. 841, 843, 44 S.Ct. 405] [question whether emergency initially justifying legislation still continued remanded to lower court]; see the seminal case of *Home Bldg. & L. Assn.* v. *Blaisdell* (1934) 290 U.S. 398, 442 [78 L.Ed. 413, 431, 54 S.Ct. 231, 88 A.I..R. 1481]; *Abie State Bank* v. *Bryan* (1931) 282 U.S. 765, 772 [75 L.Ed. 690, 701, 51 S.Ct. 252].)

Of particular interest are *Arneson* v. *Olson, supra,* 270 N.W.2d 125, *Boucher* v. *Sayeed, supra,* 459 A.2d 87 and two cases each from Florida and Pennsylvania. In *Arneson,* the North Dakota Supreme Court held unconstitutional as a denial of equal protection a monetary limit on the amount of compensation recoverable by malpractice victims. The court held that the limitation amounted to a drastic curtailment of the rights of malpractice victims and was not justified by the Legislature's purpose to enhance the availability and lower the cost of malpractice insurance. The trial court had found that there was no crisis attributable to these factors, and the North Dakota Supreme Court upheld this finding, stating (at p. 136) that the "evidence in the case before us . . . indicates that either the Legislature was misinformed or subsequent events have changed the situation substantially" because malpractice insurance rates in North Dakota are the sixth lowest in the United States.

In *Boucher,* it was held that, while a medical malpractice crisis may have existed when legislation requiring the submission of malpractice claims to a liability panel was first enacted, there was no crisis at the time the legislation was amended. Absent such a crisis, held the court, the requirement that malpractice plaintiffs submit their claims to such a panel denied them equal protection. (459 A.2d at p. 93.)

The Florida cases considered the constitutionality of a statute requiring plaintiffs to submit malpractice claims to a medical liability mediation panel. Initially, the Florida Supreme Court held the statute constitutional on its face. (*Carter* v. *Sparkman* (Fla. 1976) 335 So.2d 802, 805-806.) Four years later, however, the court reversed itself, holding that the statute had proved "unworkable and inequitable in practical operation," thereby denying due process to plaintiffs in malpractice actions. (*Aldana* v. *Holub* (Fla. 1980) 381 So.2d 231, 237.)

Substantially the same sequence occurred in Pennsylvania. The Supreme Court of that state refused initially to declare unconstitutional a statutory requirement that a malpractice litigant submit his case to an arbitration panel. (*Parker* v. *Children's Hospital of Philadelphia* (1978) 483 Pa. 106 [394 A.2d 932, 938-940].) After several years of experience with the procedure, however, the court held that the lengthy delays in the arbitration

process denied malpractice litigants of their constitutional right to trial by jury, and held the statute requiring arbitration unconstitutional. (*Mattos* v. *Thompson* (1980) 491 Pa. 385 [421 A.2d 190, 195].)

As the majority observe, many jurisdictions have enacted statutes to deal with the problems posed by malpractice insurance. Only a few of the decisions cited by the majority (maj. opn., *ante,* at p. 369, fn. 9) deal with substantive limitations on recovery such as section 667.7. Rather, they affirm the constitutionality of procedural conditions to recovery, such as the requirement that a plaintiff submit his claim to a malpractice review panel before filing an action. (E.g., *Everett* v. *Goldman, supra,* 359 So.2d 1256, 1267; *Attorney General* v. *Johnson, supra,* 385 A.2d 57, 65-66; *Paro* v. *Longwood Hospital* (1977) 373 Mass. 645 [369 N.E.2d 985, 992]; *Linder* v. *Smith* (1981) — Mont. — [629 P.2d 1187, 1192].)

A few cases have upheld more substantive limitations on the rights of malpractice plaintiffs, such as the abolition of the collateral source rule (e.g., *Eastin* v. *Broomfield* (1977) 116 Ariz. 576 [570 P.2d 744, 752-753]; *Pinillos* v. *Cedars of Lebanon Hospital Corp., supra,* 403 So.2d 365, 368; *Rudolph* v. *Iowa Methodist Medical Ctr.* (Iowa 1980) 293 N.W.2d 550, 559) and monetary limitations on the fees of plaintiffs' attorneys (*Johnson* v. *St. Vincent Hospital, Inc.* (1980) 273 Ind. 374 [404 N.E.2d 585, 602-603]) and on the amount of recovery (*id.,* at p. 598).

However, the decisions are by no means unanimous. Both substantive and procedural limitations have been struck down in a significant number of decisions. These cases have held unconstitutional the requirement for submission of malpractice claims to a review panel (*Aldana* v. *Holub, supra,* 381 So.2d 231, 237; *Mattos* v. *Thompson, supra,* 421 A.2d 190, 195; *State, Cardinal Glennon Mem. Hosp.* v. *Gaertner* (Mo. 1979) 583 S.W.2d 107, 110; *Boucher* v. *Sayeed, supra,* 459 A.2d 87, 93-94), imposition of a monetary limitation on recovery (*Carson* v. *Maurer* (1980) 120 N.H. 925 [424 A.2d 825, 836, 838]; *Arneson* v. *Olson, supra,* 270 N.W.2d 125, 136; *Simon* v. *St. Elizabeth Medical Center* (1976) 30 Ohio Ops.2d 164 [355 N.E.2d 903, 910]; *Wright* v. *Central DuPage Hospital Association, supra,* 347 N.E.2d 736, 743), abolition of the collateral source rule (*Doran* v. *Priddy* (D.Kan. 1981) 534 F.Supp. 30, 37; *Graley* v. *Satayatham* (1976) 74 Ohio Ops.3d 316 [343 N.E.2d 832, 836]; see also, *Jones* v. *State Board of Medicine, supra,* 555 P.2d 399), limitations on attorneys fees (*Heller* v. *Frankston* Pa. Commw. 294 (1983) [464 A.2d 581, 586-587]), and a special statute of limitations for certain minors (*Schwan* v. *Riverside Methodist Hosp.* (1983) 6 Ohio St.3d 300 [452 N.E.2d 1337, 1339]; *Sax* v. *Votteler, supra,* 648 S.W.2d 661, 667).

We are aware of only two cases which have ruled on the constitutionality of a provision for periodic payments. One of these held the statute unconstitutional on the ground that it unreasonably discriminated against malpractice plaintiffs and deprived them of the right to dispose of their property (*Carson* v. *Maurer, supra,* 424 A.2d 825, 836), while the other upheld the constitutionality of the provision against an equal protection challenge, reasoning that it was intended to benefit a claimant who required long term care (*State* ex rel. *Strykowski* v. *Wilkie, supra,* 261 N.W.2d 434, 443).[4] Thus, the cases from other jurisdictions which have considered the constitutionality of legislation similar to MICRA are not consistent in their results.

The rationale employed by the majority could just as logically justify the abolition of any right to recovery by victims of malpractice if it served to induce recalcitrant doctors not to withhold their services from the public and to carry insurance. In my opinion, this legislation, which I indicated at the outset merely benefits the wrongdoer at the expense of his victim, is unconstitutional as a denial of equal protection of the law.

Rattigan, J.,* concurred.

**BIRD, C. J.**—I respectfully dissent. Today's majority opinion ignores the lessons of history. This is not the first time that tort victims have, in the face of a "crisis," been deprived of their constitutional rights. In the late 1920's and 1930's, many states, including California, enacted panic legislation restricting the right of automobile guest passengers to obtain relief from negligently inflicted harm. (See *Rudolph* v. *Iowa Methodist Medical Ctr.* (Iowa 1980) 293 N.W.2d 550, 561 (dis. opn. of Reynoldson, C. J.), citing (1973) 23 Drake L.Rev. 216, 217; Stats. 1929, ch. 787, § 1, p. 1580.) It was not until 1973 that this court recognized this constitutional violation and invalidated the automobile guest statute as applied to negligently injured guests. (See *Brown* v. *Merlo* (1973) 8 Cal.3d 855, 882 [506 P.2d 212, 66 A.L.R.3d 505].) With today's majority opinion, it appears that once again years will pass and many victims of negligence will undergo injury without adequate relief before their constitutional rights will be recognized and respected.

The periodic payment provision of the Medical Injury Compensation Reform Act (hereafter MICRA) (Code Civ. Proc., § 667.7)[1] violates the con-

---

[4] The statute considered in *Strykowski* is significantly different than section 667.7. It requires that future medical expense awards of more than $25,000 be paid to a fund to be disbursed in periodic payments as expenses are incurred, until the amount is exhausted or the patient dies.

*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.

[1] Unless otherwise noted, all statutory references are to the Code of Civil Procedure.

stitutional guarantees of trial by jury and equal protection of the laws. (Cal. Const., art. I, §§ 16, 7, art. IV, § 16.)

## I.

Section 667.7 deprives medical malpractice victims of their constitutional right to a jury trial. Under that section the judge possesses the power to nullify the jury's award of damages even though the award is entirely proper. A defendant who fails to convince the jury enjoys a second chance before the judge. This procedure violates the very essence of the right to trial by jury.

"Trial by jury is an inviolate right and shall be secured to all . . . ." (Cal. Const., art. I, § 16.) In the civil context, this constitutional guarantee embodies the common law right to jury trial as it existed at the time the Constitution was adopted. (*Southern Pac. Transportation Co.* v. *Superior Court* (1976) 58 Cal.App.3d 433, 436 [129 Cal.Rptr. 912].) Although the guarantee does not require rigid adherence to the letter of common law practice, it does prohibit any impairment of the " 'substantial features of a jury trial.' " (*Jehl* v. *Southern Pac. Co.* (1967) 66 Cal.2d 821, 828-829 [59 Cal.Rptr. 276, 427 P.2d 988] [hereafter *Jehl*].)

The determination of damages by the jury is one such "substantial feature" of the jury trial. It is well established that the constitutional guarantee entitles the parties in a personal injury action to a jury finding on the quantum of damages. (See *Langdon* v. *Superior Court* (1923) 65 Cal.App. 41, 43-44 [223 P. 72]; *Farrell* v. *City of Ontario* (1919) 39 Cal.App. 351, 353-357 [178 P. 740].) Indeed, it has been said that "in a civil case a jury determination of the quantum of damages *is* the very essence or substance of the right to trial by jury." (Comment, *Remittitur Review: Constitutionality and Efficiency in Liquidated and Unliquidated Damage Cases* (1976) 43 U.Chi.L.Rev. 376, 389.)

Under section 667.7, the jury makes the initial award of damages. However, in cases involving awards of $50,000 or more in "future damages," the court *must,* upon request by either party, order that this portion of the award be paid in periodic installments. The amount and schedule of these payments is determined not by the jury but by the court. (§ 667.7, subds. (a), (b)(1).) Further, in the event that the plaintiff dies before receiving the full award, the court must determine what portion of the award was attributable to loss of future earnings. (See maj. opn., *ante,* at p. 377.) Only that

portion survives the plaintiff's death. (§ 667.7, subds. (b)(1), (c), (f); see maj. opn., *ante,* at p. 368, fn. 8.)[2]

According to the majority, the statute should be construed to provide for a jury determination of the "future damages" component of the award. (See maj. opn., *ante,* at p. 376.) They impliedly concede that a contrary construction would render the statute constitutionally defective. (*Ibid.*) For reasons explained later in this opinion (see *post,* at pp. 393-395), the majority's construction is contrary to the clear wording and legislative intent of the statute. However, there is a far more fundamental flaw in the majority's approach.

Accepting arguendo the majority's construction, section 667.7 nevertheless violates the jury trial guarantee. In holding to the contrary, the majority ignore the actual impact of the statute on the plaintiff's right to a jury trial.

To fulfill its role under section 667.7, the trial court must resolve numerous issues of fact concerning the nature of the plaintiff's injury. Each of these issues can be decisive in determining the amount of monetary relief that will actually be paid by the tortfeasor to the tort victim. Even small variations in the court's findings can produce large disparties in the amount actually paid. Indeed, the court's factfinding power rivals that of the jury in its actual impact on both the plaintiff and the defendant.

First, the court must make a finding as to the period over which the plaintiff will suffer future injury. On this issue alone, the court's factfinding power can prevent the malpractice victim from receiving the bulk of the jury award.

The problem is best illustrated by a hypothetical case. The jury has awarded $100,000 based on its conclusion that the plaintiff will live to suffer injury for three years. The court, on the other hand, finds that the injury will be spread over 10 years instead of 3, and schedules the payments in 10 annual installments of $10,000 each.[3] The plaintiff then dies after receiving three installments totaling $30,000. The remaining seven years of payments—which, under the jury's findings, would have been paid to the plaintiff prior to his or her death—would instead remain in the hands of the

---

[2]For the full text of section 667.7, see the majority opinion, *ante,* at page 366-367, footnote 7.

[3]Where, as in the present case, the trial judge does not exercise his discretion to require a special verdict or jury interrogatories (§ 625), he has no way of knowing the specific conclusions reached by the jury in the course of calculating its award.

defendant. (§ 667.7; see maj. opn., *ante,* at p. 368, fn. 8.)[4] In short, the court would have deprived the plaintiff of 70 percent of the jury award.

Such deprivation will be common under section 667.7. Whenever the court overestimates the life span found by the jury, the plaintiff will be deprived of a substantial portion of the jury award. For example, in the above hypothetical case, a court error of only one year would deprive the plaintiff of 25 percent of the jury award.[5]

The potential for defeating the jury award is augmented by the necessity for a court finding as to the timing of plaintiff's needs within the period of injury. If the court finds, contrary to the jury, that the plaintiff's needs will be less at the beginning of the period than at the end, the plaintiff may be deprived of the jury award when it is most needed.[6]

The court must also second-guess the jury's finding as to the expected rate of inflation over the period of compensation. If the period is a long one, a small variation in findings could produce a significant difference in the actual recovery. The opinion in *Florida Medical Center, Inc.* v. *Von Stetina* (Fla. App. 1983) 436 So.2d 1022, is instructive on this point. There, the court invalidated a periodic payment provision that closely resembled section 677.7, reasoning that the provision was constitutionally defective since it provided no method for the court to reconstruct the jury's finding as to future damages before discounting to present value. (*Id.,* at pp. 1028-1029.) Like the statute in *Florida Medical Center,* section 667.7 authorizes the court to convert the jury's discounted award into periodic payments.

Of far greater significance is the court's role in determining what portion of the award is attributable to the loss of future earnings. As the majority recognize, "[t]his figure will become of crucial importance in the event that

---

[4]For simplicity, this example assumes that the plaintiff's award does not include any compensation for loss of future earnings. It also omits any consideration of discounting or inflation. As explained below, inclusion of these variables further demonstrates the extent of the court's power to alter the jury award.

[5]Before dying, the plaintiff would have received $75,000 in three annual installments of $25,000 each. The remaining $25,000, 25 percent of the jury award, would remain with the defendant.

[6]If, for example, the plaintiff has contracted a degenerative disease, the rate of degeneration will become a hotly contested issue of fact. To make the example more specific, a finding on when the plaintiff is likely to lose the use of legs or arms would obviously be a major determinant of his or her needs and, therefore, of the timing of periodic payments. (§ 667.7, subd. (f).) For the plaintiff who is disabled two years after judgment—as predicted by the jury—but whose payments will not reflect that disability for another five years because of the court's contrary finding, it is of small comfort that the jury made the initial determination of the total award.

the plaintiff dies before the judgment is fully paid, because section 667.7, subdivision (c) provides that damages for future earnings—unlike the other components of future damages—must continue to be paid to a plaintiff's dependents after the plaintiff's death." (Maj. opn., *ante,* at p. 377, fn. 14.) Unfortunately, the majority omit to mention the potentially "crucial" impact of this court finding in their discussion of the jury trial guarantee.

In short, under section 667.7, the timing and the specific components of the plaintiff's injury will take on added importance. A defendant who loses before the jury will have an opportunity to gut the jury award by winning on these issues before the judge. The statute thus presents the specter of adversary parties entering a court of law, disputing issues of fact essential to a common law cause of action, and depending ultimately upon the *court's* findings of fact—*not the jury's*—to determine the outcome.

The majority fail to confront the immense impact of the court's factfinding powers on the jury award. Instead, they dispense with the issue by referring to three assertedly analogous practices elsewhere in the law: the additur procedure (see *Jehl, supra,* 66 Cal.2d 821), court administration of monetary relief awarded to minors and incompetent persons (Prob. Code, § 3600 et seq.), and court apportionment of wrongful death recoveries among individual heirs (§ 377).

However, these supposed analogies only highlight the magnitude of section 667.7's intrusion on the jury function. None of these situations involves a direct infringement of rights guaranteed at common law.

The additur procedure is employed only after the plaintiff has moved for a new trial and the court has determined that the jury's award is "clearly inadequate." (*Jehl, supra,* 66 Cal.2d at p. 832.) At that point, the court may order the defendant either to accept a court-determined increase in the award or to undergo a new trial on the issue of damages. (*Id.,* at p. 827, fn. 1.)

This procedure differs from section 667.7 in two crucial respects. First, the court's determination does not become binding until after *both* parties have rejected the jury determinations available to them. In moving for a new trial, the plaintiff chooses to forego the initial jury award. Similarly, in accepting the court's determination, the defendant declines the option of a new jury trial. By contrast, section 667.7 provides for court-determined periodic payments upon the request of *either* party and without any preliminary finding of jury error.

Second, and more fundamentally, the additur procedure represents a relative expansion of the procedural rights held at common law. As noted above, the Constitution embodies the common law right to jury trial. In upholding additur, the *Jehl* court noted that under the common law a party did not enjoy *any* right to a reassessment of damages by a second jury. (See *Jehl, supra,* 66 Cal.2d at pp. 830-831.) The first jury's determination was conclusive. (*Id.,* at p. 831.) Hence, under the common law, the plaintiff in *Jehl* would have been bound by the initial verdict, however inadequate. On balance, the additur procedure represented an improvement in the plaintiff's position over what it had been at common law.

By contrast, section 667.7 directly cuts back on the common law right to jury trial. As the majority acknowledge, tort judgments were not subject to periodic payment at common law. (See maj. opn., *ante,* at p. 376.) Plaintiffs enjoyed the right to a lump sum payment in the amount awarded by the jury. Hence, far from being incidental to an improvement in the rights of medical malpractice victims, section 667.7 creates a new power in the court to defeat a jury award.

The majority's citations to the Probate Code and the wrongful death statute are no more helpful. These provisions do not affect the quantum of damages paid by the defendant to the plaintiff. Nor does either of them intrude on a proceeding that was covered by the common law right to jury trial. Hence, it is not surprising that neither has ever been challenged on jury trial grounds in a reported case.

Probate Code section 3600 et seq. authorize the court to administer judgments received by minors and incompetents. After making disbursements for the costs and expenses of the action, the court either turns over the remainder to a guardian or conservator or holds it for the benefit of the minor or incompetent. (*Ibid.*; see also 6 Witkin, Summary of Cal. Law (8th ed., 1984 supp.) Parent and Child, § 103E, pp. 231-232.) In *no* case does the court reduce the amount of the judgment or provide the defendant with a refund.

Further, the court's power to act in the interest of minors and incompetents derives from the Probate Code, not the common law. Since there was no common law right to trial by jury in probate proceedings, the right generally exists only when granted by statute. (*Estate of Baird* (1916) 173 Cal. 617, 619 [160 P. 1078]; see also *In re Bundy* (1919) 44 Cal.App. 466, 468-471 [186 P. 811] [constitutional right to jury trial does not apply to guardianship proceedings].) Thus, Probate Code section 3600 et seq., unlike section 667.7, do not impinge on the common law right to jury trial.

. Similarly, the wrongful death statute authorizes the court to distribute damages among the heirs of the deceased. (§ 377.) In performing this task, the court does not reduce the quantum of damages or resolve any factual dispute between the plaintiff and the defendant. Indeed, it has been said that "[t]he defendant has no interest in the division which the plaintiffs may make among themselves, or which may be made for them, of the damages recovered." (*Robinson* v. *Western States Gas etc. Co.* (1920) 184 Cal. 401; 410 [194 P. 39].)[7] Moreover, it should be noted that the cause of action for wrongful death is exclusively statutory in origin. (See 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 785, pp. 3082-3083.) Although section 377 is not codified in the Probate Code, the court's role in distributing the award among the heirs of the deceased is closely related to its general role in probating estates. As noted above, probate proceedings are not generally covered by the jury trial guarantee.

For all of the above reasons, the trial court's power to schedule periodic payments and determine damages due to loss of future earnings violates the jury trial rights of medical malpractice victims.

In addition to those fatal flaws, section 667.7 provides for an intrusion on the jury's factfinding function that even the majority impliedly acknowledge to be unconstitutional—court determination of "future damages." As the majority recognize, "this 'future damage' figure plays a number of crucial roles: (1) it identifies the amount that the jury has determined as attributable to past and present damages, an amount which the plaintiff will be entitled to receive in an immediate lump sum payment at the time of judgment, and (2) it determines whether the periodic payment procedure will be applicable to the case or not—depending on whether future damages are found to equal or exceed $50,000. If the finding on the amount of future damages were left solely to the court, the court might seriously underestimate the award which the jury intended as compensation for losses which the plaintiff has already incurred, thereby significantly undermining the statutory purpose of affording a fair correlation between the sustaining of losses and the payment of damages." (Maj. opn., *ante,* at p. 376.)

The majority attempt to avoid this problem by "construing" the statute to require a jury determination of future damages. First, they find the statute to be ambiguous. (See maj. opn., *ante,* at p. 374.) Then they apply the

---

[7]The heirs are not considered to be adversary parties in relation to each other. "The statutory cause of action for wrongful death . . . is one to be exercised by all the heirs, yet it is a joint one, a single one and an indivisible one." (*Watkins* v. *Nutting* (1941) 17 Cal.2d 490, 498 [110 P.2d 384].) Hence, there is no provision for the heirs to bring separate actions or to bring actions against each other.

principle that a statute should be construed to avoid doubts as to its constitutionality. (See *id.,* at p. 376.)

Unfortunately, this well-intentioned construction is untenable. The statute makes only one specific reference to the allocation of factfinding functions on the issue of future damages: "In entering a judgment ordering the payment of future damages by periodic payments, the *court* shall make a specific finding as to the dollar amount of periodic payments which will compensate the [plaintiff] for such future damages." (§ 667.7, subd. (a), italics added.)

The majority maintain that this sentence is ambiguous. However, the legislative history eliminates any potential for misunderstanding. The Assembly deleted from the bill language that would have provided for the jury to determine future damages.

In its initial proposed version, section 667.7 provided that "the *jury* or the court, in the event the trial is without a jury, shall make a specific finding as to the dollar amount of periodic payments which will compensate the [plaintiff] for such future damages." (Assem. Bill No. 1, as amended June 6, 1975, 13 Assem.J. (1975-1976 Second Ex. Sess.) p. 60, italics added.) Subsequently, the bill was amended to delete any reference to the jury. Instead, the court was directed to make the required finding. (§ 667.7, subd. (a).)

Nevertheless, the majority claim that the legislative history is inconclusive. They rely on the first sentence of section 667.7, subdivision (a), which states that periodic payments are to be ordered "if the award equals or exceeds fifty thousand dollars ($50,000) in future damages." They assert that this clause suggests that "the amount attributable to future damages will be determined as part of the overall determination of 'the award.'" (Maj. opn., *ante,* at p. 375, fn. 13.)

The majority's reliance on this clause is misplaced. At the time that the bill was amended to provide for a court determination of periodic payments, the clause did not mention future damages. (See Assem. Bill No. 1, as amended June 11, 1975, 13 Assem.J., *supra,* at pp. 60, 86.) Hence, at that point, the bill provided unambiguously for a court determination of future damages.

An examination of the subsequent amendments gives no indication of a legislative intent to change this directive. The first sentence was amended three times by the Senate. (See 10 Sen.J. (1975-1976 Second Ex. Sess.)

pp. 107, 129, 175.)[8] Each change altered the preconditions for the ordering of periodic payments. (See *ibid.*) No change gave any indication of a legislative intent to reallocate factfinding functions between the judge and the jury. The combination of the terms "award" and "future damages," relied upon by the majority, did not appear until August 11, two months after all reference to the jury had been deleted. (*Id.,* at p. 175.) Moreover, the two terms were added at different times. (*Id.,* at pp. 107, 129.)

It strains credulity to argue, as does the majority, that these incremental adjustments to the preconditions for periodic payments were intended to alter the Assembly's unambiguous directive that the trial court was to determine future damages. I cannot endorse such a far-fetched theory. In my view, the majority have redrafted the statute in their attempt to save it.

In conclusion, section 667.7 gives the judge, not the jury, effective control over the quantum of monetary relief that will actually be paid to medical malpractice victims by tortfeasors. A defendant who loses before the jury will have a second chance before the judge. Even under the majority's construction of the statute, the court's factfinding powers in scheduling periodic payments and determining the portion of damages attributable to loss of earnings unconstitutionally infringe upon the well-established right of tort victims to a jury finding of damages. In addition, section 667.7 authorizes the court to determine the "future damages" figure used as the basis for periodic payments—a finding which even the majority impliedly admit to be encompassed within the jury trial guarantee. The majority's attempt to evade this defect by "construing" the statute to require a jury determination of future damages is untenable in view of the Assembly's express rejection of proposed language that would have enacted their construction. Clearly, section 667.7 violates the constitutional guarantee of trial by jury.

---

[8]At various times, the first sentence provided for periodic payments to be ordered:

(1) ". . . if the payment of such particular payments is not to be completed within three calendar years after the rendering of the court award." (Assem. Bill No. 1, as amended June 11, 1975, 13 Assem.J., *supra,* at p. 86.)

(2) ". . . if the payment of such particular payments is not to be completed within three calendar years after the rendering of the court award, or if the award equals or exceeds one hundred thousand dollars ($100,000)." (Assem. Bill No. 1, as amended June 25, 1975, 10 Sen.J., *supra,* at p. 107.)

(3) ". . . if the payment of such particular payments is not to be completed within three calendar years after the rendering of the court award, or if the award equals or exceeds fifty thousand dollars ($50,000)." (Assem. Bill No. 1, as amended June 27, 1975, 10 Sen.J., *supra,* at p. 129.)

(4) ". . . if the award equals or exceeds fifty thousand dollars ($50,000) in future damages." (Assem. Bill No. 1, as amended August 11, 1975, 10 Sen.J., *supra,* at p. 175.)

## II.

MICRA was enacted in response to a medical malpractice "crisis" resulting from rising malpractice insurance premiums. (Stats. 1975, Second Ex. Sess. 1975-1976, ch. 2, § 12.5, p. 4007.) The periodic payment provision (§ 667.7) seeks to alleviate this "crisis" by shifting part of the burden from negligent healthcare providers and their insurance companies to a small group of severely injured medical malpractice victims who suffer $50,000 or more in future damages.

Plaintiff argues that section 667.7 violates the equal protection guarantee of the California Constitution. That section divides personal injury tort victims into two classes: medical malpractice victims and all other personal injury tort victims. Medical malpractice victims are not entitled to the full amount of their jury awards. Instead, their compensation depends upon a court-determined schedule of payments. (§ 667.7, subd. (a).) If these victims die before receiving their full awards, they forfeit the remainder, minus damages attributable to future earnings. (§ 667.7, subds. (b), (c), (f); see maj. opn., *ante,* at p. 368, fn. 8.) If the court fails to predict accurately the timing of the victim's needs, compensation will not be available when it is needed most. (See *ante,* at p. 366, fn. 6; see also dis. opn. of Mosk, J. at pp. 379-380.)

Section 667.7's classification of tort victims is paralleled by a corresponding classification of tortfeasors. Personal injury tortfeasors are divided into two classes: medical malpractice tortfeasors (i.e., doctors and other healthcare providers) and all other personal injury tortfeasors. Medical malpractice tortfeasors are exempted from the general rule that a personal injury judgment must be paid immediately in a lump sum. Instead, they are permitted to pay the judgment in installments. In the event that the plaintiff dies before the payments are completed, these tortfeasors are relieved of their obligation to complete the payments except as to damages for loss of future earnings. (§ 667.7, subds. (b), (c), (f).) There is nothing in the statute to prevent the tortfeasor or its insurance carrier from retaining the unpaid portion of the victim's award for its own private use.

In applying the equal protection guarantee, it is not this court's role to assess the desirability of legislative enactments. As a general matter, "[t]he Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted." (*Vance* v. *Bradley* (1979) 440 U.S. 93, 97 [59 L.Ed.2d 171, 176, 99 S.Ct. 939], fn. omitted.) Only

when the political process malfunctions should the judicial branch intervene. (See generally Choper, Judicial Review and the National Political Process (1980); Ely, Democracy and Distrust (1980).)

The distinction between strict and lowered scrutiny serves to separate cases likely to warrant intervention from the bulk of constitutional challenges. If the legislation burdens a fundamental interest of the affected class, or if the burdened group is one which is structurally disadvantaged in the political process, then there is reason for concern that the interests of that group may not have been adequately considered in the process. Hence, strict judicial scrutiny is applied. (*Serrano* v. *Priest* (1976) 18 Cal.3d 728, 768 [135 Cal.Rptr. 345, 557 P.2d 929].)

Absent a fundamental interest or a suspect classification, the probability that a classification results from a harmful breakdown in the political process is not sufficiently great to warrant strict scrutiny. Such cases call for judicial deference to legislative factfinding and policy judgments. Accordingly, under lowered scrutiny, a classification need only bear a "substantial and rational" relation to a legitimate state purpose to pass constitutional muster. (See *Brown* v. *Merlo, supra,* 8 Cal.3d at pp. 872-873, 882.)

Plaintiff concedes that section 667.7 does not affect a fundamental interest or burden a suspect class. Nevertheless, it is argued that the discrimination imposed by section 667.7 warrants careful judicial scrutiny. Various inherent characteristics of the burdened group prevent it from adequately advancing its interests in the political process. It is an extraordinarily small group to be singled out to carry the burden of a general "crisis." Its members—malpractice victims with future damages of over $50,000—may be, as was plaintiff here, physically or mentally disabled. Membership in the group is *involuntary.*

The group is "selected" at random, ensuring that its members will be scattered and isolated from one another. At the time MICRA was enacted, the individuals who were to make up the group were unaware of that fact. Thus, they could not defend themselves. From the viewpoint of an individual at that time, the risk of becoming a malpractice victim with damages of over $50,000 was infinitesimal. There was no incentive to engage in coalition building or lobbying.

Now, the harm has fallen on a few identifiable individuals, but there is little incentive for them to seek legislative reform. The Legislature generally deals with prospective concerns; the injured tort victims seek retroactive relief. In short, the group burdened by section 667.7 is one which legislators

might single out for discriminatory treatment with few, if any, political consequences.

Further, it is argued that the affected interest is personal, not commercial, in character. Alteration of a personal injury tort remedy affects the victim's right to live free—to the extent possible—from the effects of negligently inflicted injury. In the words of the Washington State Supreme Court, "[t]he right to be indemnified for personal injuries is . . . in many cases fundamental to the injured person's physical well-being and ability to continue to live a decent life." (*Hunter* v. *North Mason High School* (1975) 85 Wn.2d 810 [539 P.2d 845, 848].) Plaintiff maintains that an interest of this magnitude invokes equal protection concerns greater than those involving purely commercial matters. Accordingly, it is urged that this court apply some form of "intermediate" scrutiny to classifications affecting personal injury tort victims.

The majority correctly decline the invitation to adopt a new level of equal protection scrutiny. This court has carefully avoided the confusing proliferation of tests advanced by the United States Supreme Court. (See *Hawkins* v. *Superior Court* (1978) 22 Cal.3d 584, 607-610 [150 Cal.Rptr. 435, 586 P.2d 916] (conc. opn. of Bird, C. J.).) Since no suspect classification or fundamental interest is involved in the present case, the rational relationship test applies. (See *Brown* v. *Merlo, supra,* 8 Cal.3d at p. 862, fn. 2.)

Unfortunately, the majority go further. In contradiction to the past practice of this court, they reduce the rational relationship test to a rubber stamp. In their view, the test is satisfied if the Legislature " 'could rationally have decided' " that the statute would promote the legislative objectives. (Maj. opn., *ante,* at p. 374, italics omitted.) This test precludes any consideration of the actual impact of the challenged legislation. It ignores both the character of the burdened class and the nature of the interest at stake.

The majority proceed to uphold section 667.7 without recognizing either the vulnerable position of medical malpractice victims or the potentially crippling impact of inadequate compensation. Instead, they attempt to limit their inquiry to the abstract logic of the classification. It should be noted that the majority fail to live up to their own test. They do consider facts that *favor* upholding the legislation. (See maj. opn., *ante,* at pp. 373-374.) Their judicial "restraint" is limited to a refusal to consider factual evidence *against* the rationality of the statute.

As a matter of abstract logic alone, the disparate treatment of medical malpractice victims clearly bears a rational relationship to the asserted pur-

poses. Legislators could rationally conclude that any reduction in damage payments—be it a few hundred dollars or total elimination of the victims' remedy—might tend to reduce malpractice premiums. Thus, total elimination of the remedy would be just as constitutional or unconstitutional as a minor reduction. And a classification burdening a large group, well represented in the political process, would be treated the same as one burdening a nonsuspect but politically vulnerable group such as a few hundred malpractice victims.

To invalidate discriminatory legislation under the majority's version of the rational relationship test, this court would have to conclude that the Legislature acted "irrationally" in passing it. As Felix Cohen observed in his classic critique of *Lochner*-era legal formalism, this type of test, taken seriously, would make of our courts "lunacy commissions sitting in judgment upon the mental capacity of legislators and, occasionally, of judicial brethren." (Cohen, *Transcendental Nonsense and the Functional Approach* (1935) 35 Colum.L.Rev. 809, 819.) That observation is as apt today as it was when written.

The majority's reductionist variant of the rational relationship test undermines the logic of the two-tier approach. This court's rejection of intermediate scrutiny is sensible only so long as the rational relationship test retains enough critical power to fulfill the functions of lowered scrutiny. (See generally, *Hawkins* v. *Superior court, supra,* 22 Cal.3d at p. 609 (conc. opn. of Bird, C. J.).)

The purpose of the rational relationship test is to put a check on the power of the Legislature to impose harmful burdens on politically defenseless groups. Justice Robert Jackson clearly explained the reasons for the test's existence over 30 years ago when he said: "[T]here is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally. Conversely, nothing opens the door to arbitrary action so effectively as to allow those officials to pick and choose only a few to whom they will apply legislation and thus to escape the political retribution that might be visited upon them if larger numbers were affected." (*Railway Express* v. *New York* (1949) 336 U.S. 106, 112-113 [93 L.Ed. 533, 539-540, 69 S.Ct. 463] (conc. opn. of Jackson, J.), quoted by this court in *United States Steel Corp.* v. *Public Utilities Com.* (1981) 29 Cal.3d 603, 611-612 [175 Cal.Rptr. 169, 629 P.2d 1381].) This incisive statement leaves no doubt that the size and vulnerability of the burdened group (is it composed of "only a few") and the extent of the burden imposed (does it seriously harm the affected group) are essential to a determination

as to whether or not a particular enactment raises concerns addressed by the rational relationship test.

Consistent with these concerns, this court has considered both the extent of the burden imposed (see, e.g., *Brown* v. *Merlo, supra,* 8 Cal.3d at p. 866) and the basic fairness or unfairness of the classification to the disadvantaged group. (See, e.g., *Coml. Communications* v. *Public Util. Com.* (1958) 50 Cal.2d 512, 524 [327 P.2d 513].)[9]

Furthermore, California courts have been relatively quick to invalidate statutes affecting remedies for negligently inflicted personal injury—statutes that may impose severe burdens on defenseless groups. (See, e.g., *Brown* v. *Merlo, supra,* 8 Cal.3d 855; *Cooper* v. *Bray* (1978) 21 Cal.3d 841 [148 Cal.Rptr. 148, 582 P.2d 604]; *Monroe* v. *Monroe* (1979) 90 Cal.App.3d 388 [153 Cal.Rptr. 384]; *Ayer* v. *Boyle* (1974) 37 Cal.App.3d 822 [112 Cal.Rptr. 636].)[10] Similarly, in *Gay Law Students Assn.* v. *Pacific Tel. & Tel. Co.* (1979) 24 Cal.3d 458 [156 Cal.Rptr. 14, 595 P.2d 592], this court applied the rational relationship test to invalidate discrimination against homosexuals. Indeed, most of this court's decisions striking down enactments on minimum rationality grounds have involved vulnerable groups and/or severe burdens.[11]

By contrast, legislation affecting only the commercial interests of voluntarily defined groups has almost invariably been upheld.[12] The sole recent

[9]It should be noted that in permitting consideration of these factors, the California courts have not surreptitiously introduced the intermediate test into equal protection doctrine. The importance of the state's interest is not assessed. By contrast, intermediate scrutiny questions whether a classification is substantially related to "important governmental objectives." (*Craig* v. *Boren* (1976) 429 U.S. 190, 197 [50 L.Ed.2d 397, 407, 97 S.Ct. 451].) The principal problem with this test is that it requires the courts to evaluate the relative importance of various legislative objectives. In effect, the test is "no more than an ad hoc evaluation of the worth of each controverted statute." (Note, *Refining the Methods of Middle-Tier Scrutiny* (1983) 61 Tex.L.Rev. 1501, 1504-1505.)

[10]Other jurisdictions have also taken a rigorous approach to personal injury litigation, striking down automobile guest statutes and medical malpractice legislation. (See Jenkins & Schweinfurth, *California's Medical Injury Compensation Reform Act: An Equal Protection Challenge* (1979) 52 So.Cal.L.Rev. 829, 867, 895-897 [hereafter Jenkins & Schweinfurth], and cases cited.)

[11]See, e.g., *Newland* v. *Board of Governors* (1977) 19 Cal.3d 705 [139 Cal.Rptr. 620, 566 P.2d 254] (group: misdemeanant sex offenders; burden: prohibition on practicing a lawful profession); *In re Kapperman* (1974) 11 Cal.3d 542 [114 Cal.Rptr. 97, 522 P.2d 657] (group: certain prisoners; burden: extended imprisonment); *Hayes* v. *Superior Court* (1971) 6 Cal.3d 216 [98 Cal.Rptr. 449, 490 P.2d 1137] (group: out-of-state prisoners; burden: extended imprisonment); *D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1 [112 Cal.Rptr. 786, 520 P.2d 10] (burden: prohibition on practicing a lawful profession).

[12]Like California courts, the United States Supreme Court has treated cases involving voluntary, economically defined classes and economic interests differently from those in-

exception appears to be *United States Steel Corp.* v. *Public Utilities Com.* (1981) 29 Cal.3d 603 [175 Cal.Rptr. 169, 629 P.2d 1381]. There, however, the constitutional analysis was not essential to the disposition of the case.

The contrasting treatment of these two groups of cases cannot be explained solely on the basis of abstract rationality. In *Brown* v. *Merlo, supra,* 8 Cal.3d 855, 882, for example, this court invalidated the automobile guest statute as applied to negligently injured guests. The statute's differential treatment of guests and paying riders was defended as being rationally related to the legitimate state purpose of preventing collusive suits. (*Id.,* at pp. 872-873.) Clearly, the Legislature could rationally have concluded that guests were *more likely* to bring collusive suits than were paying customers. However, this court found the classification of *all* automobile guests overinclusive: "Instead of confining its disability to those who actually institute collusive suits, the provision reaches out beyond such persons and burdens the great number of honest automobile guests." (*Id.,* at p. 877.) Accordingly, the classification was held to violate the equal protection clause. (*Ibid.*)

Like the classification invalidated in *Brown,* section 667.7's classification of *all* tort victims with future damages of more than $50,000 is overinclusive. According to the majority, this classification is rationally related to the Legislature's purpose of lowering malpractice insurance premiums. (See maj. opn., *ante,* at p. 373.) The majority casually assume that the savings due to periodic payments and reduced plaintiff recoveries will be used to reduce premiums. (*Ibid.*) However, MICRA contains no provision requiring insurance carriers to pass on savings. There is nothing to prevent them from retaining the proceeds for their own private use. Hence, section 667.7 burdens not only those malpractice victims whose hardship due to periodic payments will be converted into lowered premiums, but also those whose sacrifices will go to swell the coffers of the insurance companies.

Indeed, according to information compiled by MICRA's principal proponent, insurance carriers devote at least 45 percent of each retained premium dollar to litigation expenses. (See Keene, *California's Medical Malpractice Crisis* in A Legislator's Guide to the Medical Malpractice Issue

volving involuntary classes defined by noneconomic characteristics or personal (as opposed to economic) interests. In the recent cases mentioning the permissive test advocated by the majority, the affected class was defined mainly by the choice of its members to pursue certain commercial activities, and the interests affected were purely financial. (See, e.g., *Exxon Corp.* v. *Eagerton* (1983) 462 U.S. 176, 196 [76 L.Ed.2d 497, 514, 103 S.Ct. 2296, 2308]; *Western & Southern L. I. Co.* v. *Bd. of Equalization* (1981) 451 U.S. 648, 672 [68 L.Ed.2d 514, 533, 101 S.Ct. 2070]; *Minnesota* v. *Clover Leaf Creamery Co.* (1981) 449 U.S. 456, 466 [66 L.Ed.2d 659, 670, 101 S.Ct. 715].)

(Warren & Merritt edits. 1976) p. 29.) Hence, it can be expected that a major portion of the savings due to reduced recoveries by medical malpractice victims will go to defend the tortfeasors in future litigation—not to reduce malpractice premiums. Further, it is estimated that another substantial portion of each retained premium dollar is expended on the administrative expenses of the insurance company. (*Ibid.*; Jenkins & Schweinfurth, *supra,* 52 So.Cal.L.Rev. at p. 940.)

The classification of tortfeasors is also over-inclusive. "A citizen or class of citizens may not be granted privileges or immunities not granted on the same terms to all citizens." (Cal. Const., art. I, § 7, subd. (b).) Section 667.7 provides medical malpractice tortfeasors with a special exemption from the general rule that negligent tortfeasors must pay a personal injury judgment in a lump sum. This special treatment is granted not only to those tortfeasors who use the resulting savings to promote the purpose of the statute by reducing premiums, but also to those who utilize the savings to their own benefit.

In conclusion, section 667.7 imposes severe burdens on a small and politically vulnerable group of severely injured medical malpractice victims. These burdens are imposed *without any guarantee* that the resulting savings will be used to further the statutory purpose of reducing malpractice insurance premiums.

Conversely, section 667.7 grants medical malpractice tortfeasors a special exemption from the obligations generally owed by negligent tortfeasors to their victims. This benefit extends to those who retain the resulting savings for their own use, as well as to those who pass on the savings in the form of reduced malpractice insurance premiums. Hence, section 667.7 burdens an overinclusive class of tort victims and benefits an overinclusive class of tortfeasors. This is not the "substantial and rational" relation between classification and legislative purpose that is required under the equal protection guarantee of the California Constitution. (*Brown* v. *Merlo, supra,* 8 Cal.3d at pp. 872-873, 882.)

Rattigan, J.,* concurred.

---

*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.