[No. D008995. Fourth Dist., Div. One. Sept. 19, 1990.]

OWREN B. ATKINS, JR., et al., Plaintiffs and Appellants, v.
EUGENE H. STRAYHORN, JR., et al., Defendants and Appellants.

## COUNSEL

Sheldon Deutsch for Plaintiffs and Appellants.

Ault, Deuprey, Jones, Danielson & Gorman, Dan H. Deuprey, Greines, Martin, Stein & Richland, Alan G. Martin, Kent L. Richland and Sheila S. Kato for Defendants and Appellants.

Horvitz & Levy, Daniel J. Gonzalez and S. Thomas Todd as Amici Curiae on behalf of Defendants and Appellants.

## OPINION

HUFFMAN, J.—Defendants Eugene H. Strayhorn, Jr., M.D., and his professional corporation, Eugene H. Strayhorn, M.D., Inc. (together Strayhorn), appeal a judgment in favor of plaintiffs Owren B. Atkins, Jr., and Eileen L. Atkins (together Atkinses[1]) on Atkinses' complaint for professional negligence. Strayhorn contends the court erred in (1) allowing Atkinses to exploit an informed consent theory of liability and to offer as expert testimony the opinion of a physician unqualified in emergency room care, (2) failing to reduce the verdict under Civil Code[2] section 3333.2 before applying the jury's comparative fault finding, (3) failing to apply a single $250,000 noneconomic damages limit to this case, and (4) disregarding the jury's finding of life expectancy.

Atkinses cross-appeal from an order denying them prejudgment interest on $270,000 as well as expert witness fees and other costs. They contend

---

[1] Where necessary, we refer to these parties in their individual capacities as Owren and Eileen.

[2] All statutory references are to the Civil Code unless otherwise specified.

because Owren received a more favorable judgment than his statutory settlement offer, he is entitled to prejudgment interest and expert witness fees.

We affirm both as to the issues on the appeal and the cross-appeal.

FACTUAL AND PROCEDURAL BACKGROUND

Just before midnight on June 20, 1983, 69-year-old Owren was taken by ambulance to the emergency room of Tri-City Hospital with a chief complaint of shaking, paleness, nausea and a history of diabetes. Owren's left toes were slightly purple. Dr. M. Kent LeMarie, the emergency room physician, examined Owren and ordered a blood count and cultures, an EKG and other tests. When Dr. LeMarie found no source of infection to explain Owren's fever, he requested a consultation with Strayhorn, the internal medicine specialist on call that night. Although the results of the blood count showed a mildly elevated white blood cell count with a "shift to the left,"[3] possibly indicating a bacterial infection, Strayhorn concluded Owren had a viral infection. At about 3 a.m. Strayhorn told Eileen her husband had the flu and could go home but scheduled a follow-up appointment at his office for 10:15 a.m. Although Owren went home, the emergency room record, signed by Dr. LeMarie, indicates he was admitted to the hospital, room 304B.

At Owren's request, Eileen cancelled the appointment with Strayhorn. When Owren's condition deteriorated during the day, he returned to the emergency room at Tri-City Hospital. X-rays showed a piece of glass embedded in his foot and a blood culture revealed streptococcus, a strain of bacterial infection. Owren was admitted to the hospital but antibiotics failed to stop the infection. Gangrene set in, necessitating the amputation of his leg below the knee.

Atkinses sued Strayhorn for professional negligence. After trial, the jury returned a special verdict, finding Strayhorn was negligent and his negligence contributed to the loss of Owren's leg. However, the jury also found Owren was 45 percent at fault. The jury awarded damages of $200,000 for past pain and suffering, $240,000 for future pain and suffering (with a present value of $193,600) and $51,600 for future medical care (with a present value of $41,624). The jury found Owren had a life expectancy of six years. The jury also found in favor of Eileen on her loss of consortium claim, but found she was 20 percent at fault and awarded her damages of $32,000 for past loss of consortium and $38,400 for future loss of consortium (with a present value of $30,976).

---

[3] A "shift to the left" means the blood count showed the presence of many more of a certain type of white blood cell called granulocytes, indicating a bacterial infection.

After two postverdict hearings, the trial court entered judgment in favor of Owren for $110,000 in a lump sum and periodic payments over a four-year period totaling $160,380. The court also entered judgment in favor of Eileen for $63,478.80 ($50,380.80 plus $13,098 in prejudgment interest).

## DISCUSSION

### STRAYHORN'S APPEAL

### I

Strayhorn contends the court erred in allowing Atkinses to exploit an "informed consent" theory of liability. He further contends the court erred in permitting Dr. Davidson, an internal medicine specialist, to testify as an expert regarding emergency room standards of care.[4] He claims these errors were prejudicial, requiring reversal of the judgment.

### A

Strayhorn asserts Atkinses improperly argued he had a duty to disclose the risks and benefits of sending Owren home from the hospital without intravenous antibiotics to treat a bacterial infection, a condition Strayhorn did not believe Owren had. In support of this assertion, Strayhorn relies on *Scalere v. Stenson* (1989) 211 Cal.App.3d 1446 [260 Cal.Rptr. 152].

In *Scalere*, the plaintiff had undergone an angiogram and later complained of discomfort in her arm. Defendant physician examined her arm and, concluding it was progressing satisfactorily, never informed her about nor recommended any further diagnostic tests or therapy. (*Scalere v. Stenson, supra*, 211 Cal.App.3d at p. 1448.) Plaintiff later underwent surgery on her arm with resulting damage and sued defendant for medical negligence. At trial, plaintiff sought to establish liability on the theory of ordinary negligence as well as the defendant's failure to disclose material facts necessary for her to properly evaluate her condition and seek appropriate postoperative care. However, the court refused plaintiff's request for a jury instruction on duty to disclose. The jury returned a verdict in favor of defendant and plaintiff appealed. (*Id.* at p. 1449.)

On appeal, the court held the trial court properly refused plaintiff's proposed instruction on duty to disclose. After discussing several cases

---

[4]Contrary to Atkinses' argument, Strayhorn was not required to request a new trial on these grounds in order to preserve the issue for appeal. (See *Schmidt* v. *Macco Construction Co.* (1953) 119 Cal.App.2d 717, 721 [260 P.2d 230] [motion for new trial is not prerequisite for review on appeal except where asserted error is excessive or inadequate damages].)

addressing a physician's duty to disclose, the court concluded defendant "proposed no postsurgery therapy and therefore did not require [plaintiff's] informed (or uninformed) consent to any such therapy." (*Scalere* v. *Stenson, supra*, 211 Cal.App.3d at p. 1450.) However, the court further concluded plaintiff " 'was not without an appropriate legal theory under which she might recover damages. *Negligent failure to advise a patient to pursue a potentially necessary course of treatment is actionable under ordinary medical negligence standards.*' " (*Id.* at p. 1453, citing *Jamison* v. *Lindsay* (1980) 108 Cal.App.3d 223, 231 [166 Cal.Rptr. 443]; italics added.)

Here, Dr. Strayhorn did not inform Atkinses of the risks and benefits of not treating a bacterial infection because he ruled out such diagnosis. Thus, the court properly rejected Atkinses' proposed instruction on informed consent. (*Scalere* v. *Stenson, supra*, 211 Cal.App.3d at p. 1453.) Nevertheless, the court properly allowed testimony and counsel's argument under a theory of ordinary medical negligence based on Dr. Strayhorn's failure to correctly diagnose Owren's condition and consequently to advise Atkinses "to pursue a potentially necessary course of treatment." (*Jamison* v. *Lindsay, supra*, 108 Cal.App.3d at p. 231.)

In this regard, Atkinses' counsel questioned Dr. Strayhorn:

"Q. But you didn't tell them about a possible foreign object, did you?

"A. No, sir.

"Q. You didn't tell them about bacteremia?

"A. No, sir.

"Q. You didn't tell them about septicemia?

"A. No, sir.

"Q. You didn't tell them that you considered I.V. antibiotics because he may have septicemia and he was a diabetic, right?

"[STRAYHORN'S COUNSEL]: Objection. Assumes facts not in evidence as to that point in time, Your Honor.

"THE COURT: Well, I'm going to overrule it, because he told us what he did tell them.

"A. I didn't discuss antibiotics with Mr. Atkins.

"Q.   You didn't tell him anything about the risks of going home without I.V. antibiotics, did you?

"A.   No, sir."

During closing argument, Atkinses' counsel told the jury: "[Owren] was not given a choice as to whether or not to be hospitalized or be given I.V. antibiotics. There is such a thing as informed consent. A doctor has the duty to disclose all relevant factors, all relevant factors, so that somebody, the patient, can make an intelligent choice as to what to do with his or her body. In this case, [Owren] was not given a choice.

"Dr. Strayhorn said he did not discuss bacteremia, septicemia, did not discuss C.B.C.'s or any of those things with the family and did not tell them that he thought about hospitalization or anything of that nature. How can this be contributory negligence?"

In order to show Strayhorn breached his duty of care in failing to properly diagnose Owren's condition and timely admit him to the hospital for appropriate treatment, Atkinses were entitled to pursue this line of questioning and argue it to the jury. This is especially true in light of the testimony presented at trial showing the medical evidence was consistent with a bacterial infection necessitating admission to the hospital and intravenous antibiotics. Moreover, counsel's argument on informed consent was made in the context of whether Owren was contributorily negligent in agreeing to leave the hospital without further treatment. Thus, the court properly allowed Atkinses to argue this theory to the jury.

### B

One of Atkinses' expert witnesses was Dr. Meyer Davidson, a specialist in internal medicine and endocrinology. When Atkinses' counsel asked Dr. Davidson whether the standard of care in this case required that Owren receive intravenous antibiotics before being released from the hospital at 3:30 a.m. on June 21, 1983, Strayhorn's counsel objected and the court allowed him to take the witness on voir dire.

On voir dire, Dr. Davidson testified he had worked as an emergency room physician between 1961 and 1963 while a resident and again between 1966 and 1969 while in the Army. He also testified he occasionally sees patients in the emergency room but not as the primary care physician. Strayhorn's counsel then asked:

"Q.   Are you holding yourself out today as an expert in what physicians should do when a patient is there in an emergency room setting?

"A. Yes. [¶] I need to qualify that: [¶] the patient who presents this way, whether it's in the emergency room or anywhere, the same consideration should occur. But I'm not holding myself out as an expert in emergency room medicine."

"[STRAYHORN'S COUNSEL]: Your Honor, I am going to, in view of the doctor indicating that he is not holding himself out as an expert in emergency medicine, object to [his] testimony as to the standard required of the emergency room on June [21st] at three in the morning." The court noted the objection but overruled it. Dr. Davidson then testified the standard of care required that Owren be hospitalized and given intravenous antibiotics.

■ Citing Health and Safety Code section 1799.110, Strayhorn contends the court erred in overruling the objection to Dr. Davidson's testimony. Subdivision (c) of that section provides: "In any action for damages involving a claim of negligence against a physician and surgeon providing emergency medical coverage for a general acute care hospital emergency department, the court shall admit expert medical testimony only from physicians and surgeons who have had substantial professional experience within the last five years while assigned to provide emergency medical coverage in a general acute care hospital emergency department. For purposes of this section, 'substantial professional experience' shall be determined by the custom and practice of the manner in which emergency medical coverage is provided in general acute care hospital emergency departments in the same or similar localities where the alleged negligence occurred."

However, Strayhorn failed to object at trial to the admission of Dr. Davidson's testimony on the proper ground. Under Evidence Code section 353, a verdict shall not be reversed due to the erroneous admission of evidence unless: "(a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear *the specific ground of the objection* or motion; and [¶] (b) The court which passes upon the effect of the error or errors is of the opinion that the admitted evidence should have been excluded *on the ground stated* and that the error or errors complained of resulted in a miscarriage of justice." (Italics added; see also *Marmion* v. *Mercy Hospital & Medical Center* (1983) 145 Cal.App.3d 72, 99 [193 Cal.Rptr. 225].)

Here, Strayhorn objected to Dr. Davidson's testimony on general competency grounds because he was not an emergency medicine expert and thus could not testify to the standard of care in the emergency room the night Owren came in. On this basis, the court properly overruled the objection because Dr. Davidson testified his opinion was the same regardless of whether the patient was in the emergency room. Although Dr. Davidson

was not a specialist in emergency medicine, he had a number of years of emergency room experience and the extent of his knowledge to express an expert opinion goes to the weight of his testimony, not its admissibility. (*Estate of Schluttig* (1950) 36 Cal.2d 416, 424 [224 P.2d 695].)

Further, even if counsel had objected under Health and Safety Code section 1799.110, any error in admitting Dr. Davidson's testimony was harmless. Dr. James Pierog, an emergency medicine specialist, also testified for Atkinses. He stated it was his opinion the standard of care required that Owren "should have been admitted to the hospital and intravenous antibiotics should have been begun." Where, as here, "independent and competent evidence to substantially the same effect from other witnesses is placed before the jury the erroneous admission of such cumulative evidence is ordinarily not prejudicial." (*Kalfus* v. *Fraze* (1955) 136 Cal.App.2d 415, 423 [288 P.2d 967].) The fact Dr. Davidson was Atkinses' first witness and may have had, in Strayhorn's opinion, "better credentials" than some of the other witnesses does not make the error any less harmless.

## II

Strayhorn contends the court erred in applying the jury's comparative fault finding before rather than after reducing the noneconomic damages under section 3333.2. He asserts the trial court's approach in entering judgment offends both comparative fault principles and the policies underlying the Medical Injury Compensation Reform Act of 1975 (MICRA)[5] (Stats. 1975, 2d Ex. Sess. 1975-1976, chs. 1, 2, pp. 3949-4007).

Section 3333.2 provides in part: "(a) In any action for injury against a health care provider based on professional negligence, the injured plaintiff shall be able to recover noneconomic losses to compensate for pain, suffering, inconvenience, physical impairment, disfigurement and other nonpecuniary damage.

"(b) In no action shall the amount of damages for noneconomic losses exceed two hundred fifty thousand dollars ($250,000)."

This section was enacted as part of MICRA, a comprehensive legislative package adopted in response to a crisis in health care precipitated by the rapidly increasing cost of medical malpractice insurance. (*American Bank & Trust Co.* v. *Community Hospital* (1984) 36 Cal.3d 359, 363-364 [204 Cal.Rptr. 671, 683 P.2d 670, 41 A.L.R.4th 233] [addressing the

[5] The California Medical Association, California Dental Association and California Association of Hospitals and Health Systems filed an amicus curiae brief in support of Strayhorn's position on the impact of MICRA contained in sections II, III and IV of this opinion.

periodic payment provision of Code of Civil Procedure section 667.7].) By placing a ceiling of $250,000 on the recovery of noneconomic damages, section 3333.2 attempts "to reduce the cost of medical malpractice litigation, and thereby restrain the increase in medical malpractice insurance premiums." (*Fein* v. *Permanente Medical Group* (1985) 38 Cal.3d 137, 159 [211 Cal.Rptr. 368, 695 P.2d 665].)

Here, the jury returned a special verdict awarding Owren $200,000 for past noneconomic losses and $240,000 for future noneconomic losses. The jury also found Owren was 45 percent negligent. In its judgment on special verdict, the court applied section 3333.2 after reducing the amount of the special verdict for noneconomic damages by Owren's 45 percent comparative fault, stating: "[T]his Court finds that a 45% reduction of the past and future non-economic damages for MR. ATKINS results in $110,000 for past non-economic damages and $132,000 for future non-economic damages, totaling $242,000 for both past and future non-economic damages. The Court further finds that Civil Code section 3333.2 therefore requires no further reduction of the non-economic damages totalling $242,000 because that amount does not exceed $250,000 as provided in subdivision (b) of Section 3333.2."

In *McAdory* v. *Rogers* (1989) 215 Cal.App.3d 1273 [264 Cal.Rptr. 71], the jury returned a special verdict finding defendant physician negligently rendered medical treatment. The jury found plaintiff suffered economic damages of $30,000 and noneconomic damages of $370,000, but further found plaintiff was 22 percent comparatively negligent. Under section 3333.2, the trial court first reduced the noneconomic damages award to $250,000, then further reduced the award by the 22 percent of plaintiff's comparative fault and entered judgment for $218,400. (*Id.* at p. 1275.)

On appeal, the sole issue was whether the trial court properly reduced the plaintiff's noneconomic damages to $250,000 before rather than after factoring in her comparative fault. The court held there was no legitimate or logical reason for doing so and reversed the judgment with directions to award plaintiff $250,000 in noneconomic damages. (*McAdory* v. *Rogers*, *supra*, 215 Cal.App.3d at p. 1281.) Recognizing it was bound by the jury's determination that plaintiff had actually suffered noneconomic damages of $370,000, the court reasoned: "Section 3333.2 does not cause those noneconomic damages [plaintiff] suffered in excess of $250,000 to vanish. Instead, that section merely reflects a legislative policy decision to bar the recovery of more than $250,000 of those damages. (See *Fein* v. *Permanente Medical Group*, *supra*, 38 Cal.3d 137, 163.)" (*Id.* at p. 1278.)

■ We agree with both the holding and reasoning of the court in *McAdory*. As in that case, we interpret the language of section 3333.2 as limiting the *recovery* rather than the value of noneconomic damages as a means of protecting the insurability of health care providers. This result is consistent with the Legislature's power to control the measure of damages a plaintiff is entitled to *receive* (*Fein* v. *Permanente Medical Group, supra,* 38 Cal.3d at pp. 158-159) while accomplishing its cost-cutting goal in a " 'reasonable' manner." (*Steketee* v. *Lintz, Williams & Rothberg* (1985) 38 Cal.3d 46, 56 [210 Cal.Rptr. 781, 694 P.2d 1153].)[6]

Contrary to Strayhorn's argument, comparative fault principles are not violated by the trial court's approach here. "[T]he primary goal of the comparative fault system is to '[maximize . . . ] recovery to the injured party for the amount of his injury to the extent fault of others has contributed to it. . . .' [Citation.]" (*McAdory* v. *Rogers, supra,* 215 Cal.App.3d at p. 1279.) The jury awarded Owren $440,000 and found he was partially at fault. Under section 3333.2, he is already receiving an amount less than the jury determined he was damaged by Strayhorn's tortious conduct. No purpose would be served by further reducing his award. (See *McAdory* v. *Rogers, supra,* 215 Cal.App.3d at p. 1279.)[7] Thus, the court properly applied the jury's comparative fault finding before reducing the noneconomic damages under section 3333.2.[8]

---

[6]Strayhorn and amici rely on *Semsch* v. *Henry Mayo Newhall Memorial Hospital* (1985) 171 Cal.App.3d 162 [216 Cal.Rptr. 913], to support their argument the court should have first reduced the verdict under section 3333.2 and then applied the jury's comparative fault finding. Amici have requested we take judicial notice of the relevant pages from the briefs filed in *Semsch* to show the issue of the proper method of calculating damages under section 3333.2 was before the court in that case. Having done so, we note the defendant in that case, without any discussion or citation of authority, suggested a method of calculation in a footnote in its reply brief. In its opinion, the court in *Semsch* "relegated its method of application of section 3333.2 to a footnote devoid of any discussion of why it was reducing the plaintiff's noneconomic damage award to $250,000 before it factored in the plaintiff's comparative fault." (*McAdory* v. *Rogers, supra,* 215 Cal.App.3d 1273, 1277.) Thus, we question whether the relationship between section 3333.2 and comparative fault principles was an issue squarely before the court in *Semsch*. Even if it were, we disagree with that court's method of computing damages and instead choose to follow the holding in *McAdory* v. *Rogers, supra,* 215 Cal.App.3d 1273.

[7]Indeed, this case illustrates how both section 3333.2 and principles of comparative fault can be given effect. By reducing the jury's verdict of $440,000 by Owren's 45 percent comparative fault, Owren receives $242,000, not the $250,000 allowed under section 3333.2. Thus, on these facts, a plaintiff who is not fault free does not recover the statutory maximum and a negligent defendant does not receive a windfall.

[8]If the comparative fault percentage is applied after damages are reduced to $250,000, the jury's damages finding in most instances would be meaningless. Section 3333.2 has no bearing on the jury's factfinding function. Although that section directly affects the final *judgment,* it is irrelevant to the jury's *verdict.* (See Medical Injury Compensation Reform Act of 1975 (MICRA) Implementation Manual, prepared for the California Medical Association, July 1988 revision, p. 55.)

## III

■ Strayhorn contends the court erred in failing to apply a single $250,000 noneconomic limit to this case. He asserts the limitation on noneconomic damages of section 3333.2 relates to a single injury-causing incident because a cause of action for loss of consortium is a claim arising out of injury to another. He further asserts the purpose of section 3333.2 can only be achieved by limiting noneconomic damages to $250,000 for each act of professional negligence regardless of the number of plaintiffs indirectly injured.

Under section 3333.2, "the injured plaintiff" is entitled to recover noneconomic losses up to $250,000 "[i]n any action for injury against a health care provider based on professional negligence . . . ." In addition to Owren being an injured plaintiff, Eileen is also an injured plaintiff, having been awarded damages for loss of consortium. Although her cause of action arises from bodily injury to her husband, the injury suffered is personal to her. "Loss of her husband's consortium impairs a wife's interests which are wholly separate and distinct from that of her husband: ' ". . . the wife's loss is just as real as it is distinct. She can no longer enjoy *her* legally sanctioned and morally proper privilege of copulation or procreation, and is otherwise deprived of *her* full enjoyment of her marital state. These are *her* rights, not his." ' [Citations.]" (*Lantis* v. *Condon* (1979) 95 Cal.App.3d 152, 157 [157 Cal.Rptr. 22]; original italics.) From a negligent defendant's perspective, Eileen "is simply a foreseeable plaintiff to whom he owes a separate duty of care." (*Ibid.*)

■ Although joinder in one action is "the preferred method for asserting a claim of loss of consortium . . ." (*Rodriguez* v. *Bethlehem Steel Corp.* (1974) 12 Cal.3d 382, 408, fn. 29 [115 Cal.Rptr. 765, 525 P.2d 669]), an action for loss of consortium can be maintained independently of the action by the physically injured spouse. (*Abellon* v. *Hartford Ins. Co.* (1985) 167 Cal.App.3d 21, 25-26 [212 Cal.Rptr. 852].) ■ Had Eileen brought a separate action for loss of consortium, there would be no doubt of her entitlement to a separate $250,000 limit.[9] The fact she voluntarily consolidated her action with that of Owren should not change the result. Where, as here, a claim for loss of consortium is joined with a spouse's claim for physical injuries in an action for medical malpractice, each spouse is entitled to recover up to $250,000 for his or her separate noneconomic losses.

---

[9] Similarly, we envision a situation where a single act by a health care provider negligently caused injury to multiple unrelated patients (e.g., contaminated medications). To say these plaintiffs were collectively entitled to $250,000 because there was only one negligent act would be to render the statute an absurdity.

Strayhorn asserts one $250,000 limit should apply to Atkinses' collective recovery because section 3333.2 speaks in terms of a single "action." In support of this argument, Strayhorn relies on *Yates v. Pollock* (1987) 194 Cal.App.3d 195 [239 Cal.Rptr. 383]. In that case, the court held a single $250,000 cap applied to a wrongful death action brought by the decedent's wife and five children. The court reasoned: "Since the Legislature was obviously aware that 'case precedent has consistently held "only *one action* [can] be brought for the wrongful death of a person thereby preventing multiple actions by individual heirs and the personal representative" . . .' and that 'the cause of action for wrongful death has been consistently characterized as "a joint one, a single one and an indivisible one" . . .' [citations], we can but conclude its use of the word 'action' in section 3333.2 represents its conscious decision to limit the total recovery for noneconomic loss in such suits to $250,000." (*Id.* at pp. 200-201; original italics.)

The holding in *Yates* is inapposite here. ■ "[T]he cause of action for loss of consortium does not resemble wrongful death because it has no statutory foundation but is entirely of judicial origin." (*Lantis v. Condon, supra,* 95 Cal.App.3d at p. 158, citing *Justus v. Atchison* (1977) 19 Cal.3d 564, 572 [139 Cal.Rptr. 97, 565 P.2d 122].) While a wrongful death action is a joint, single and indivisible one, loss of consortium is a separate and independent claim from a spouse's claim for personal injury. (*Lantis v. Condon, supra,* 95 Cal.App.3d at p. 157.) Moreover, in wrongful death actions, the fault of the decedent is attributable to the surviving heirs whose recovery must be offset by the same percentage. (*Lemos v. Eichel* (1978) 83 Cal.App.3d 110, 114, fn. 1 [147 Cal.Rptr. 603].) In contrast, a spouse's damages for loss of consortium are not proportionately reduced by the amount of comparative negligence attributable to the other spouse. (See *Lantis v. Condon, supra,* 95 Cal.App.3d at p. 159.)[10] ■ Indeed, the jury found Owren's comparative fault to be 45 percent but found Eileen's to be only 20 percent. Thus, unlike an action for wrongful death, Eileen's claim for loss of consortium is not merely derivative of Owren's claim for personal injuries.

The language of section 3333.2 supports our conclusion the $250,000 limit of noneconomic damages applies separately to Owren's and Eileen's independent claims. The statute focuses on the "injured plaintiff" who is

---

[10] Amici curiae's reliance on *Casaccia v. Green Valley Disposal Co.* (1976) 62 Cal.App.3d 610, 613 [133 Cal.Rptr. 295] and *Cole v. Fair Oaks Fire Protection Dist.* (1987) 43 Cal.3d 148, 162-163 [233 Cal.Rptr. 308, 729 P.2d 743], is likewise misplaced. The holdings in those cases barring a wife's claim for loss of consortium where the injured husband's claims came under the exclusive jurisdiction of the Workers' Compensation Appeals Board were based on the "broad language of the Labor Code sections." (*Cole v. Fair Oaks Fire Protection Dist., supra,* 43 Cal.3d at p. 163.) No such statutory exclusion exists in a medical malpractice context.

entitled to recover noneconomic losses in an amount not to exceed $250,000. Nothing in the statute limits the defendant's liability to that amount. Had the Legislature intended to limit the defendant's liability encompassing all legal proceedings arising from a single act of professional negligence to $250,000, it would have included the language "single act of negligence" to accomplish this purpose. Contrary to Strayhorn's assertion, the statute does not limit noneconomic damages to "a single injury-causing incident." Rather, recovery is limited for the discrete injury to each spouse because damages flow from injury, not negligent acts.

Our holding does not defeat the goal of section 3333.2 to ensure the availability of health care and the enforceability of judgments against health care providers by making medical malpractice insurance affordable. The amount of noneconomic damages is still limited to $250,000 for each injured plaintiff and thus will not result in "'the unknown possibility of phenomenal awards for pain and suffering that can make litigation worth the gamble.'" (*Fein* v. *Permanente Medical Group, supra*, 38 Cal.3d at p. 163.) Moreover, noneconomic damages will be no less predictable because a loss of consortium action can only be brought by one person—the spouse. (See *Borer* v. *American Airlines, Inc.* (1977) 19 Cal.3d 441, 444 [138 Cal.Rptr. 302, 563 P.2d 858]; *Elden* v. *Sheldon* (1988) 46 Cal.3d 267, 277-278 [250 P.2d 254, 758 P.2d 582].) Accordingly, the court correctly applied a separate $250,000 limit to both Owren's and Eileen's claims.

## IV

In its special verdict, the jury found Owren's life expectancy to be six years. In requesting the court to order periodic payments of future damages under Code of Civil Procedure section 667.7, Strayhorn argued the payments should be uniform over a six-year period. Instead, the court found the jury's verdict on life expectancy to be "advisory only" and that it had discretion under Code of Civil Procedure section 667.7 to order periodic payments over a period of time less than Owren's remaining life expectancy.[11]  Strayhorn contends the court erred in disregarding the jury's finding of life expectancy. He further contends the court's use of four years over which it ordered periodic payments was entirely arbitrary.

Under Code of Civil Procedure section 667.7, subdivision (a), the court must, at the request of either party, enter a judgment ordering the money for future damages be paid periodically rather than in one lump sum where a medical malpractice action results in an award of $50,000 or more for

---

[11] The court ordered payment as follows: $4,855 per month the first year, $3,930 per month the second year, $3,815 per month the third year, and $765 per month the fourth year.

future damages. "The judgment ordering the payment of future damages by periodic payments shall specify the recipient or recipients of the payments, the dollar amount of the payments, the interval between payments, and the number of payments or the period of time over which payments shall be made. . . ." (Code Civ. Proc., § 667.7, subd. (b)(1).)

In enacting the periodic payment provision for medical malpractice actions, the Legislature intended that "courts will utilize such judgments to provide compensation sufficient to meet the needs of an injured plaintiff and those persons who are dependent on the plaintiff *for whatever period is necessary* while eliminating the potential windfall from a lump-sum recovery which was intended to provide for the care of an injured plaintiff over an extended period who then dies shortly after the judgment is paid, leaving the balance of the judgment award to persons and purposes for which it was not intended." (Code Civ. Proc., § 667.7, subd. (f); italics added.)

Consistent with legislative intent, the jury's role is to designate the amount of future damages subject to periodic payment while the court's role is to fashion the details of a periodic payment schedule. (*American Bank & Trust Co.* v. *Community Hospital, supra*, 36 Cal.3d at pp. 376-377.)

In structuring a periodic payment schedule, a trial court is simply "guided," not bound, by the evidence of future damages introduced at trial. (See *American Bank & Trust Co.* v. *Community Hospital, supra*, 36 Cal.3d at p. 377.) Nowhere in the statutory scheme or legislative history is the court's periodic payment schedule necessarily dependent on, nor must it directly correspond to, a plaintiff's life expectancy. Instead, life expectancy is one of several factors for the court to consider in structuring a periodic payment schedule "for whatever period is necessary." (Code Civ. Proc., § 667.7, subd. (f).) The fact periodic payments may cease before a plaintiff's death does not defeat the statutory purposes of providing sufficient compensation to meet the plaintiff's needs and preventing a windfall in the event of the plaintiff's early death.

Here, the court ordered payments over four years, implicitly finding Owren's anticipated expenses and losses in the future would be incurred in a shorter period of time than his projected life expectancy as found by the jury. The court acted well within its discretion in so finding.[12] The evidence

---

[12] Contrary to Strayhorn's argument, the court did not disagree with or disregard the jury's finding as to Owren's life expectancy. Rather, the court ruled future damages need not be spread evenly over Owren's six-year remaining lifetime. Thus, the court's periodic payment order did not invade the jury's constitutional role as trier of fact. (See *Jehl* v. *Southern Pac. Co.* (1967) 66 Cal.2d 821, 829 [59 Cal.Rptr. 276, 427 P.2d 988]; *American Bank & Trust Co.* v. *Community Hospital, supra*, 36 Cal.3d at p. 377.)

showed Owren would need psychiatric care for a period of one and one-half to two and one-half years at an approximate cost of $25,000 per year. The evidence also showed Owren presently needed a new prosthesis and wheel-chair at a cost of $4,319. The jury awarded $51,600 for future medical expenses which, after reduction by Owren's 45 percent comparative fault, left $28,380 subject to periodic payments. Because the prosthesis and wheel-chair are immediate needs and the psychiatric care is required for the first two years after trial, the record supports payment over a period substantially less than six years.

Owren's remaining future damages are noneconomic. In ordering a four-year periodic payment schedule, the court reviewed all the appropriate factors as presented by the evidence, including Owren's condition as an insulin-dependent diabetic, his status as a retired sergeant major of the Marine Corps, his life-style, the status of his health and the pattern of his activities. Although no one can accurately predict whether pain and suffering will ever completely disappear, the trial court could reasonably assume Owren's mental anguish would be favorably impacted by psychiatric care and thus, order payments over a period of four years. By so doing, the court attempted to match "losses with compensation by helping to ensure that money paid to an injured plaintiff will in fact be available when the plaintiff incurs the anticipated expenses or losses in the future." (*American Bank & Trust Co.* v. *Community Hospital, supra*, 36 Cal.3d at p. 369.) We conclude the court acted within its discretion in structuring a periodic payment schedule.

ATKINSES' CROSS-APPEAL

I

Atkinses contend Owren is entitled to prejudgment interest under section 3291 because he obtained a more favorable judgment than his settlement offer. Under section 3291, "[i]f the plaintiff makes an offer pursuant to Section 998 of the Code of Civil Procedure which the defendant does not accept prior to trial or within 30 days, whichever occurs first, and the plaintiff obtains a more favorable judgment, the judgment shall bear interest at the legal rate of 10 percent per annum calculated from the date of the plaintiff's first offer pursuant to Section 998 of the Code of Civil Procedure which is exceeded by the judgment, and interest shall accrue until the satisfaction of judgment."

Before trial, Atkinses served Strayhorn with an offer to compromise under Code of Civil Procedure section 998 in the amount of $249,999. Strayhorn did not accept the offer. The judgment for Owren resulted in

immediate payment of $110,000 and the gross amount of $160,380 in periodic payments over four years. After trial, Atkinses requested prejudgment interest, costs and expert witness fees, arguing they received a judgment more favorable ($270,380) than their offer to compromise. The court denied the request as to Owren,[13] finding his past damages and the *present value* of his future damages, reduced by his comparative fault, resulted in a verdict of $239,370.20.

The trial court properly denied Atkinses' request for prejudgment interest as to Owren. In order to determine whether Owren received a more favorable judgment, his settlement offer, which was for a lump sum, must be compared to the present lump sum monetary equivalent of what he was awarded at trial. Part of the judgment, however, was ordered to be paid in monthly periodic payments over the course of four years. Because monthly payments cannot be valued without findings as to present value (*Hurlbut* v. *Sonora Community Hospital* (1989) 207 Cal.App.3d 388, 409 [254 Cal.Rptr. 840]), the jury was instructed as to present cash value (BAJI No. 14.70 (7th ed. 1986) pp. 202-203) and determined in its special verdict the present value of the future periodic payments which the court used to value the judgment. Thus, Owren was awarded $239,370.20, not $270,380. In essence, he is receiving "a lesser value tied to the cost of obtaining a stream of payments distributed over a substantial period of time." (*Schneider* v. *Kaiser Foundation Hospitals* (1989) 215 Cal.App.3d 1311, 1320 [264 Cal.Rptr. 227].)

Our conclusion is consistent with the holding of this court in *Schneider* v. *Kaiser Foundation Hospitals, supra,* 215 Cal.App.3d 1311. There, we held the "total value" of periodic payments awarded to a plaintiff under Code of Civil Procedure section 667.7 is *not* the arithmetic sum of all future payments required by the award, but rather the *present value* of the periodic payments. (*Id.* at p. 1314.) Although the issue in *Schneider* related to the value of an award of periodic payments for the purpose of calculating a contingent attorney's fee, the same reasoning applies here in the context of determining the value of an award of periodic payments for the purpose of calculating whether prejudgment interest is warranted.

## II

Atkinses contend the judgment should be modified to award Owren expert witness fees and other costs under Code of Civil Procedure section 998, subdivision (d). That section provides: "If an offer made by a plaintiff is not

---

[13] The court did, however, grant the request for prejudgment interest as to Eileen because the verdict in her favor exceeded her settlement offer.

accepted and the defendant fails to obtain a more favorable judgment, the court in its discretion may require the defendant to pay a reasonable sum to cover costs of the services of expert witnesses, who are not regular employees of any party, actually incurred and reasonably necessary in either, or both, the preparation or trial of the case by the plaintiff, in addition to plaintiff's costs." However, as we previously concluded, the judgment was less than Owren's settlement offer. Thus, he is not entitled to expert witness fees and costs under Code of Civil Procedure section 998, subdivision (d).[14]

## DISPOSITION

The judgment is affirmed. All parties to bear their own costs.

Benke, Acting P. J., and Nares, J., concurred.

---

[14] In their cross-appellants' opening brief, Atkinses further contend (1) they are entitled to postjudgment interest on periodic payments and (2) these future payments should not be discounted to present value. However, in their reply brief, they have voluntarily abandoned these issues.